LEXSEE 2000 U.S. DIST. LEXIS 18091

**W.R. GRACE & CO. - CONN., Plaintiff, v. ZOTOS INTERNATIONAL, INC., Defendant.**

98-CV-838S(F)

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NEW YORK

*2000 U.S. Dist. LEXIS 18091*

November 2, 2000, Decided
November 2, 2000, Filed

**DISPOSITION:** [*1] Plaintiff's motion to amend (Doc. # 8) GRANTED.

**COUNSEL:** PHILLIPS, LYTLE, HITCHCOCK, BLAINE & HUBER, Attorneys for the Plaintiff, KEVIN M. HOGAN, of Counsel, Buffalo, NY.

BOND, SCHOENECK & KING, LLP, Attorneys for the Defendant, THOMAS R. SMITH, of Counsel, Syracuse, NY.

**JUDGES:** LESLIE G. FOSCHIO, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** LESLIE G. FOSCHIO

**OPINION**

**DECISION AND ORDER**

**JURISDICTION**

This matter was referred to the undersigned by order of the Hon. William M. Skretny dated February 9, 1999 for all proceedings pursuant to *28 U.S.C. § 636 (b)(1)(A)*. It is presently before the court on Plaintiff's motion for leave to file an amended complaint, filed September 16, 1999 (Doc. # 8).

**BACKGROUND**

This action for contribution of response costs incurred by Plaintiff was brought on December 30, 1998 pursuant to Section 113(f)(1) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), *42 U.S.C. § 9801, et seq.*, and New York law. Defendant's response to the motion to amend was filed October 4, 1999 (Doc. #'s 11, 12); Plaintiff's reply was filed October 12, 1999 (Doc. # 14); oral argument [*2] on the motion to amend was conducted October 21, 1999. Supplemental briefing of the issue of responsibility for orphan shares in a CERCLA contribution action, raised during oral argument, were received by the court from the parties by letters dated October 29, 1999, November 8, 1999, November 12, 1999, and November 22, 1999 (Doc. #'s 30, 31, 32, and 33).

**FACTS** [1]

---

[1] Taken from the pleadings and papers filed in the action.

Plaintiff alleges that Defendant is liable to it for contribution related to response costs incurred by Plaintiff in complying with an administrative consent order between Plaintiff and the New York State Department of Environmental Conservation for cleanup of a hazardous waste dump site known as the Brewer Road Site ("the Site") located near Waterloo, New York, and is therefore liable to Plaintiff for Defendant's equitable share of such costs pursuant to *42 U.S.C. § 9613(f)(1)* and New York's law of contribution, *N.Y. Civ.Prac.L. & R. § 1401* (McKinney 1997), applicable [*3] to joint and several tortfeasors. Specifically,

Case 1:07-cv-04639-HBP   Document 13-2   Filed 11/20/2007   Page 2 of 20

Page 2
2000 U.S. Dist. LEXIS 18091, *3

Plaintiff asserts that Defendant, previously named Sales Affiliates, Inc., through a related company, Evans Chematics, Inc. ("Evans"), produced hair care products, between 1942 and 1963 at a facility in Waterloo. The Site is a private landfill owned by Evans and used for the disposal of wastes generated by Evans until 1959.

Defendant owned the Waterloo facility from 1942 to 1954 when Evans purchased it from Defendant, including Defendant's hair care production equipment, and continued production of hair care products for Defendant until 1963. Plaintiff's Memorandum of Law filed September 116, 1999 (Doc. # 9) at 3. Defendant and Evans were commonly owned and operated by the Evans family. The Waterloo facility was first purchased in 1941 or 1942 by Defendant. *Id.* Part of the plant was leased to Evans for its organic chemical manufacturing business. *Id.* in 1946, Defendant leased the entire plant to Evans, and Evans assumed the responsibility pursuant to requirements contracts for production of Defendant's hair care products, including cold and hot waves, shampoos, conditioners and dyes. *Id.* The Brewer Road Site was purchased [*4] by Evans in 1950 for disposal of wastes generated by Evans's organic chemicals operations and its production of Defendant's hair care products at the Waterloo facility. *Id.*

In 1963, Evans moved the hair care production activity to a new facility in Geneva, New York, while its organic chemicals operation remained at the Waterloo facility until 1978 when the organic chemical business assets and the Site were sold to Plaintiff. *Id.* at 4. Evans's hair care production on behalf of Defendant in Geneva continued until 1967 when, according to Plaintiff, all of its assets and employees relating to production of Defendant's hair care products were transferred back to Defendant, which continued the hair care products manufacturing operations using Evans employees and equipment. *Id.*

The Site had not been used as a landfill since 1958 or 1959, and Evans ceased manufacturing Defendant's hair care products in 1967. Plaintiff claims that during the 1950's, the relevant period of waste disposal for purposes of the instant action, Evans operated two distinct businesses at the Waterloo facility, *i.e.* the Evans hair care production assets, acquired by Defendant in 1967, and the Evans [*5] organic chemical division, eventually acquired by Plaintiff in 1978. *Id.* at 7. According to Plaintiff, Defendant arranged with Evans to have the hair care products' waste and hazardous substances, resulting from manufacturing process of the Defendant's hair care products, including rejected products and discarded products returned at Defendant's direction, transported to the Site by Evans during 1950 - 1959. Thus, Plaintiff alleges Defendant is primarily liable as an arranger pursuant to *42 U.S.C. § 9607(a)(3)*.

Based on information derived from depositions conducted in June, 1999, Plaintiff seeks to allege that as a result of its purchase of Evans's assets in 1967 and continuing operation of the hair care production business, Defendant is a successor to the liabilities of Evans, resulting from waste disposal at the Site during the 1950's, including a portion of the response costs, based upon Defendant's purchase and operation of Evans's business of producing Defendant's hair care products as well as Evans's sending of wastes to the Site. Plaintiff also alleges Defendant directed large quantities of discarded products to Evans which in turn arranged [*6] for their disposal at the Site. Plaintiff therefore contends Defendant is liable, pursuant to *42 U.S.C. § 9607*, through successor liability, for the disposal of hazardous waste resulting from Evans's hair care manufacturing operations, and is therefore liable to Plaintiff for contribution pursuant to *42 U.S.C. § 9613(f)(1)*, for Evans's allocable share of response costs in connection with the Site, in addition to its responsibility for its share of the response costs as an arranger as presently alleged in the Complaint.

## DISCUSSION

A. Plaintiff's Motion to Amend.

*Fed. R. Civ. P. 15* provides that leave to amend a pleading "shall be freely granted when justice so requires." An amended complaint may be filed pursuant to *Fed. R. Civ. P. 15(a)* where the new allegations do not unduly prejudice an opponent, are not the result of undue delay or bad faith, and are not futile. *Foman v. Davis, 371 U.S. 178, 181, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962)*. Absent a showing that significant additional discovery burdens will be incurred or that the trial of the matter will be significantly delayed, amendment should be permitted. [*7] *Block v. First Blood Associates, 988 F.2d 344, 350 (2d Cir. 1993)*.

Defendant argues in opposition that Plaintiff's motion is beyond the April 30, 1999 cut-off established by the court's Scheduling Order, filed March 25, 1999;

Case 1:07-cv-04639-HBP   Document 13-2   Filed 11/20/2007   Page 3 of 20

Page 3
2000 U.S. Dist. LEXIS 18091, *7

that Plaintiff had access to Defendant's records from which its proposed successor liability claim could have been earlier alleged; that if the proposed theory had been advanced in the Complaint, Defendant would have conducted its defense and related discovery differently; that many of the witnesses germane to the 1967 purchase of Evans's assets by Defendant are no longer available for deposition; and that the Plaintiff's proposed successor liability theory is futile because it is nevertheless time-barred and unavailing on the merits.

In reply, Plaintiff states until it had conducted several depositions of Defendant's witnesses, several months after the deadline for amending the pleadings, it was not aware of the 1967 transaction; that the new liability theory arises from the same essential facts as pleaded in the Complaint; that Defendant has had access to the information underlying both Defendant's defense that Plaintiff succeeded to Evans's [*8] liability by virtue of the 1978 sale of Evans's organic chemical product assets to Plaintiff and Plaintiff's proposed claim of successor liability; that no applicable statute of limitations has expired and, even if it has, the proposed claim relates back to the date of the Complaint under *Fed. R. Civ. P. 15(c)*; and that the merits of proposed claims of successor liability cannot be determined without further discovery.

(1) Dilatoriness.

Plaintiff states that only after discovery commenced, in accordance with what, in retrospect, was an overly ambitious schedule providing a discovery cut-off of September 1, 1999, did Plaintiff learn that during the 1950's Defendant's hair care products were produced by Evans's employees on Defendant's behalf, not by Defendant, as Plaintiff initially believed. Plaintiff further asserts that regardless of Plaintiff's prior accessibility to former Evans employees and records from which the fact of the 1967 transaction may have been learned, such was simply unknown to Plaintiff until substantive discovery in this action was commenced.

Defendant's opposition papers recount in fair detail the heavily intertwined history of the corporate and operating [*9] relationships between Defendant and Evans,--both companies were owned by the same family and engaged in shared corporate services--however, they do not reveal that Plaintiff was specifically appraised, prior to filing the Complaint on December 30, 1998, of the fact of Defendant's acquisition 1967 of the assets of Evans upon which Plaintiff's proposed successor liability theory is based. *See, e.g.*, Letter of Thomas L. Smith, Esq. to Kevin M. Hogan, Esq., dated March 11, 1998, Exhibit E, Affidavit of Thomas L. Smith, Esq., in Opposition to Plaintiff's Motion to Amend (Doc. # 12) ("Smith Letter"), *passim*. While Mr. Smith's letter emphasizes Plaintiff's liability based on its purchase of the organic chemical manufacturing assets of Evans in 1978, a careful reading of the communication and its attachments gives no indication of the earlier 1967 acquisition by Defendant of Evans's assets relating to hair care products. Moreover, Defendant's responses to Plaintiff's interrogatories relating to Defendant's contractual relations with Evans also provide no hint of Defendant's 1967 acquisition of an ownership interest in Evans's hair care products production assets. *See* Exhibit D [*10] to Hogan Affidavit at PP7, 13.

By repeatedly directing Plaintiff's attention to Evans as a primary focus of Plaintiff's contribution action, Defendant thus sought, unsurprisingly, to distance itself from any cleanup liabilities flowing from the hair care production activities conducted by Evans on Defendant's behalf at the Waterloo facility. For example, Defendant recites two facts it claims placed Plaintiff "on notice of the essential facts" upon which Plaintiff's proposed successor liability claims is based: that (1) Evans manufactured Defendant's hair care products at the Waterloo facility, and (2) Defendant assumed responsibility for manufacturing these products when that Evans division was transferred to the Geneva facility in 1963. Smith Affidavit, P10. As is apparent, neither fact includes that Defendant purchased Evans' hair care manufacturing assets in 1967, an event well know to Defendant.

Although Defendant has asserted Plaintiff had prior access to documents upon which successor liability theory could have been earlier raised, it has failed to provide any specific substantiation for this proposition. Thus, the court finds Plaintiff was not dilatory in seeking the instant [*11] amendment and that the belated discovery of "essential facts" upon which the proposed amendment is based constitutes good cause for allowing the instant motion beyond the deadline established in the scheduling order. *Fed.R.Civ.P. 16(b)*. Defendant does not contend Plaintiff has been guilty of any general lack of diligence in prosecuting this action or bad faith in seeking the amendment.

These considerations distinguish the instant case

Case 1:07-cv-04639-HBP   Document 13-2   Filed 11/20/2007   Page 4 of 20

Page 4
2000 U.S. Dist. LEXIS 18091, *11

from the facts on *State of New York v. Solvent Chemicals Co., Inc.*, 179 F.R.D. 90 (W.D.N.Y. 1998), relied upon by Defendant, where the court denied leave to amend to add a new party whose identity and involvement in the disposal of wastes at the site in that case was a matter of record for well over 10 years. By contrast, the record here shows Defendants did not make known the 1967 transaction, but, rather, provided information tending to deflect Plaintiff's attention from such fact.

(b) Prejudice.

Defendant contends that had it been on notice of Plaintiff's intention to assert successor liability it would have conducted discovery differently and that as a result of Plaintiff's delay in seeking to add this claim, evidence, particularly [*12] elderly witnesses, have become unavailable. Defendant further argues that it had no notice of the possibility of a successor liability allegation based on the 1967 transaction which occurred after Evans's hair care production operation were transferred in 1963 to the Geneva facility. Defendant's Memorandum at 13, 16 n. 7. However, this contention overlooks the fact that Defendant has asserted successor liability as a defense against Plaintiff's contribution claim based on Plaintiff's 1978 acquisition of Evans's organic chemical assets and the Site. Moreover, Plaintiff's proposed First Amended Complaint plainly limits Defendant's successor liability to the generation and disposal of wastes of hair care products at the Waterloo, not the Geneva, facility. Exhibit A, P20, Hogan Affidavit.

As to the availability of evidence, this argument equally affects Plaintiff if not more so than Defendant, as it is Plaintiff who carries the ultimate burden on its proposed successor liability claim. Finally, the parties agree, and the court concurs, to an enlargement of time within which to complete discovery in this action. Trial is not imminent, and Plaintiff's motion for partial summary judgment [*13] is pending before Judge Skretny. Accordingly, Plaintiff's assertions of prejudice are insufficient to defeat Plaintiff's motion.

(c) Futility.

Contrary to Defendant's contention, the proposed amended complaint is not time barred. First, a successor liability claim is not a claim to which a statute of limitations attaches. Rather, it constitutes an additional ground upon which the liability sought through the underlying cause of action, in this case a contribution action under CERCLA § 113(f)(1), may be established. Expansion of a defendant's exposure to liability based on a proposed pleading is not a bar to amendment. *Town of New Windsor v. Tesa Tuck, Inc.*, 919 F. Supp. 662, 676-78 (S.D.N.Y. 1996). Where no new cause of action is asserted, amendment should be granted. *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 87 (2d. Cir. 1999). Here, Defendant is already a party to Plaintiff's contribution action, and the proposed claim for successor liability presents no new cause of action against it.

Even if the proposed claim is subject to a statute of limitations, it is not barred in this case as to render it futile. While the parties predicate [*14] their arguments on the statute of limitations scheme provided for CERCLA contribution actions under § 113(g)(3), if, as Defendant contends, a successor liability claim is one to which a statute of limitations applies, it is not an action for contribution, and in the absence of any statute of limitations for such a successor liability claim provided under CERCLA, no statute of limitations applies to the proposed amendment.

Assuming, *arguendo*, § 113(g)(3) applies to Plaintiff's proposed amended claim, the claim is not untimely. The parties concede that none of the three triggering events for a CERCLA contribution claim as provided in § 113(g)(3) have or can occur in this case. Accordingly, the three year statute of limitations of § 113(g)(3) has not, and will not, commence against Plaintiff's claim.

Defendant relies on *Sun Company, Inc. (R&M) v. Browning-Ferris, Inc.*, 124 F.3d 1187 (10th Cir. 1997), cert. denied, 522 U.S. 1113, 140 L. Ed. 2d 110, 118 S. Ct. 1045 (1998) which held that where none of the three events for accrual of a § 113(f)(1) contribution claim can arise because, as here, a responsible party plaintiff incurs response costs [*15] based on its agreement to remediate in accordance with a state agency's administrative order, that the relevant period of limitations and accrual is provided in § 113(g)(2). In *Sun*, the Court found that under such circumstances, the contribution action becomes the "initial action" for cost recovery under CERCLA § 107 thus bringing such action within § 113(g)(2). However, the court's analysis overlooks the plain wording of § 113(g)(2) which refers to an initial action pursuant to § 107 for response costs based on a "removal" or "remedial" action. As defined, respectively, in 42 U.S.C. § 9601(23), (24) response costs for neither a

"removal" nor a "remedial" action are being sought pursuant to § 107 in this case. Rather, the instant action seeks equitable apportionment of the response costs already incurred by Plaintiff as a responsible party who cannot seek such relief pursuant to § 107. *See Bedford Affiliates v. Sills, 156 F.3d 416, 425 (2d Cir. 1998)*. Moreover, if the holding in *Sun* were accepted it results in two separate statute of limitation periods and accrual mechanisms for CERCLA contribution actions, a result unlikely to [*16] have been Congress' intent. If a gap exists in the statute of limitations for CERCLA actions under § 113(f)(1), it is one to be resolved by Congress. *See Reichhold Chemicals, Inc. v. Textron, Inc., 888 F. Supp. 1116, 1125 (N.D.Fla. 1995)* (refusing to borrow another statute of limitations where no triggering event under § 113(g)(3) had or was likely to occur). Accordingly, *Sun* is not persuasive authority, and the proposed amendment is not futile as time-barred.

(d) Relation Back.

*Fed.R.Civ.P. 15(c)(2)* permits an amended claim to relate back to the original pleading if such claim arises out a the same "conduct, transaction or occurrence." The purpose of the relation-back doctrine is to assure the case is determined upon the merits, and not procedural technicalities. *Siegel v. Converters Transportation, Inc. 714 F.2d 213, 216 (2d Cir. 1983)*. "If the litigant has been advised at the outset of the general facts from which the belatedly asserted claim arises, the amendment will relate back . . .." *Tri-Ex Enterprises, Inc. v. Morgan Guaranty Trust Co. of New York, 586 F. Supp. 930, 932 (S.D.N.Y. 1984)*.

Here, the Complaint alleges [*17] Defendant's liability for contribution based on Plaintiff's incurring of response costs for remediation of the Site because of disposal of wastes from hair care products manufacturing activities at the Waterloo facility, pursuant to requirements contracts between Evans and Defendant, during the 1950's. Complaint, P9, 11. Plaintiff also alleged that Defendant had directed its customers to return its defective and outdated products to the Waterloo facility for disposal by Evans. *Id.*, P18. Thus, the core of Plaintiff's allegations is that Defendant is liable to it, in contribution, for hazardous waste generation and disposal from the Waterloo facility resulting from the manufacture of its products. The proposed successor liability claim therefore arises out of the same conduct, transactions and occurrence, and properly relates back to the Complaint pursuant to *Rule 15(c)(2)*. As Defendant concedes, the Complaint is not untimely under § 113(g)(3) and, accordingly, the proposed amendment is likewise not time barred.

Defendant further asserts that Plaintiff cannot succeed on the merits of the proposed successor liability allegation under applicable state law. Defendant relies on *United States v. Best Foods, 524 U.S. 51, 141 L. Ed. 2d 43, 118 S. Ct. 1876 (1998)*. [*18] However, the Supreme Court did not hold in *Best Foods* that state law governed the issue or successor liability in a CERCLA action. *See Best Foods, supra 118 S. Ct. at 1886 n. 9*. Moreover, even if New York law applied to this question, given Plaintiff's allegations that as Defendant's ownership and control of the Evans hair care products operation remained substantially the same after the 1967 transaction, there is at least a colorable basis upon which successor liability would lie. *See Parra v. Production Mach. Co., 611 F. Supp. 221, 223-24 (E.D.N.Y. 1985)* (applying New York law to find successor liability under "mere continuation" test). In any event, regardless of whether the "substantial continuity test" adopted in *B.F. Goodrich v. Betkoski, 99 F.3d 505, 519 (2d Cir. 1996)* or New York state law is applied, until discovery is completed on Plaintiff's proposed successor liability claim based on the 1967 transaction, the merits of the new claim cannot be determined. Thus, the court finds that Plaintiff's proposed successor liability claim cannot be found to be futile at this time.

## CONCLUSION

Based on the foregoing, Plaintiff's motion to amend [*19] (Doc. # 8) is GRANTED. Plaintiff shall file and serve its First Amended Complaint within 10 days of service of this order.

SO ORDERED.

LESLIE G. FOSCHIO

UNITED STATES MAGISTRATE JUDGE

Dated: November 2d, 2000

Buffalo, New York

| | | |
|---|---|---|
| STATE OF ILLINOIS | ) | |
| | ) | **DECLARATION** |
| COUNTY OF COOK | ) | **OF THOMAS C. RATCHFORD** |

I, Thomas C. Ratchford, being first duly sworn, declares and states as follows:

1. As of 1995, I was the Vice President of Finance, Treasurer, Secretary and Chief Financial Officer of Stimsonite Corporation ("Stimsonite") based in Niles, Illinois. I ended my employment with Stimsonite in 2000.

2. As of 1995, Stimsonite was a publicly traded company that manufactured and sold reflective products which allowed drivers to more clearly see traffic lanes, construction sites and road signs.

3. Around 1995, Stimsonite and Pave-Mark Corporation ("Pave-Mark") began discussing a possible transaction by which Stimsonite would acquire substantially all of the assets of Pave-Mark, which manufactured thermoplastic pavement-marking material and related application equipment and was located in the Atlanta, Georgia area.

4. Along with counsel and other management, I was substantially involved in the negotiation of and due diligence surrounding this transaction.

5. At the time of the negotiations, Pave-Mark was a privately owned company owned and controlled by Mr. Marty Smith and his family.

6. The Smith family's stated an interest in selling the assets of Pave-Mark in exchange for cash consideration so Marty Smith could exit the business and retire.

1

7. As a result of these negotiations, the parties entered into an Asset Purchase Agreement ("APA") dated April 28, 1995, an accurate copy of which is attached as Exhibit 1 hereto. The APA was negotiated at arm's length, and there was no pre-existing relationship between Stimsonite and Pave-Mark. Both parties employed outside counsel to handle the transaction.

8. The asset purchase was not intended to be and was not a constructive merger. Pave-Mark ownership received cash proceeds, not Stimsonite stock, in the transaction.

9. As described in the APA, Stimsonite did not intend to assume and did not assume any unidentified, later-arising tort liabilities related to products sold by Pave-Mark prior to the closing.

10. To my knowledge, the Smith family exited the business after the closing of the asset purchase.

I declare under penalty of perjury that the foregoing is true and correct.

_____  10/25/07
Thomas C. Ratchford

[Conformed Copy]

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") dated as of April 28, 1995 is by and among PAVE-MARK CORPORATION, a Florida corporation ("Seller"), and MARTIN A. SMITH, JUDITH SMITH and WALTER B. FINLEY, (collectively, the "Stockholders") and STIMSONITE CORPORATION, a Delaware corporation (including any of its wholly-owned subsidiaries, "Buyer");

### W I T N E S S E T H:

WHEREAS, Seller is currently engaged in the business of designing, manufacturing and selling thermoplastic materials and application equipment for highway pavement marking (the "Business"), which Seller conducts through the Facilities (as defined in Section 6.1(e));

WHEREAS, the Stockholders collectively own at least 85% of the issued and outstanding voting capital stock of Seller;

WHEREAS, Seller desires to sell to Buyer and Buyer desires to purchase from Seller substantially all of the properties and assets owned by Seller and used in the Business; and

WHEREAS, the Stockholders have determined that the transactions set forth in this Agreement are in the best interest of Seller and such transactions will benefit, directly and indirectly, the Stockholders and all other stockholders of Seller;

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained and other good and valuable consideration had and received, Buyer, Seller and the Stockholders hereby agree as follows:

### ARTICLE I.  PURCHASE AND SALE OF ASSETS

1.1  *Purchase and Sale of Assets*.  Except as otherwise provided herein and in Section 1.3, at the Closing (as defined in Section 4.1), Seller shall sell, assign, transfer and deliver to Buyer and Buyer shall purchase and acquire, as a going concern, from Seller the assets, properties, rights and interests of every kind and description, tangible or intangible, owned by Seller and relating to the Business as the same shall exist as of the Closing Date (as defined in Section 4.1) but expressly excluding the Retained Assets (as defined herein) (such acquired assets, properties, rights and interests being hereinafter collectively referred to as the "Acquired Assets").  Without limiting the

CHMAIN02 Doc 106227_1

generality of the foregoing, the Acquired Assets shall include the following:

(a) <u>Balance Sheet Assets</u>. The assets, properties, rights and interests set forth on the Initial Balance Sheet (as defined in Section 6.1(f)), except to the extent that any such assets, properties, rights or interests have been disposed of by Seller in the ordinary course of business consistent with past practice after the Balance Sheet Date (as defined in Section 6.1(f)) and otherwise in accordance with the terms of this Agreement, and the assets, properties, rights and interests set forth on the Closing Balance Sheet;

(b) <u>Facilities</u>. All of Seller's right, title, interest and benefits in, to or under the lease agreements (the "Lease Agreements") more particularly described on the Schedule entitled "Leases" attached hereto;

(c) <u>Prepaid Items</u>. All of Seller's right, title, interest and benefits in, to or under prepaid expenses, advance payments, deposits and prepaid items, including, without limitation, prepaid interest and deposits with lessors, suppliers or utilities;

(d) <u>Inventory</u>. All of Seller's inventory, including, without limitation, all inventories of raw materials, work-in-process, finished goods, products, supplies, equipment, parts, labels and packaging materials (collectively, "Inventory");

(e) <u>Accounts Receivable</u>. All of Seller's accounts and notes receivable, including royalties receivable, (other than such receivables listed on the Schedule entitled "Retained Contracts" attached hereto), any payments received by Seller with respect thereto after the Closing Date, unpaid interest accrued on any such accounts and notes receivable and any security or collateral relating thereto (collectively, "Accounts Receivable");

(f) <u>Tangible Personal Property</u>. All tangible personal assets and property owned or leased by Seller that, as of the Closing Date, is located at, or is used in connection with, the Facilities or which relates to the Business, including, without limitation, all motor vehicles (other than those listed on the Schedule entitled "Other Retained Assets" attached hereto), machinery, equipment, business machines, furniture, tools, fixtures and leasehold improvements;

(g) <u>Books, Records and Other Written Materials</u>. All of Seller's documents, records, files and reports (including any of such held or produced by third parties for Seller) relating to the Business or the Acquired Assets, whether

written or printed or electronically stored, including, without limitation, all accounting and financial records, operating records, invoices, forms, designs, diagrams, drawings, computer programs (including object code and source code), data bases, technical data, formulations, equipment lists, service and parts records, user, repair and warranty records, collection and credit records, inventory records, sales records and any other confidential information that has been reduced to writing or electronically stored;

(h) <u>Catalogs and Advertising Materials</u>. All of Seller's promotional and advertising materials, including, without limitation, all catalogs, brochures, plans, customer lists, supplier lists, manuals, handbooks, equipment and parts lists and sales agent, dealer and distributor lists;

(i) <u>Customer List</u>. A list of all the customers and potential customers to whom or to which Seller has distributed or sold products (individually, a "Customer" and collectively, "Customers," such terms to include any assignee or successor, whether by consolidation, merger, sale of assets or otherwise), including the dollar volume of sales for each of the top ten customers in each of the past four years, all as listed or described on the Schedule entitled "Customer List" that Seller will provide to Buyer at Closing;

(j) <u>Rights Under Confidentiality Agreements</u>. All of Seller's right, title, interest and benefits, if any, in, to or under any (i) employee confidentiality agreements entered into by Seller and (ii) confidentiality and secrecy agreements entered into by Seller with third parties, in each such case to the extent the obligations of the parties thereto relate to the use or disclosure of information relating to the Business or any Acquired Assets;

(k) <u>Intellectual Property Rights</u>. Any and all of Seller's know-how, licenses, permits, franchises, shop rights, developments, research data, designs, artwork, brands, private labels, computer software (including proprietary software and its object code and source code), active and stored data bases and information, logos, technology, test procedures, processes, formulae, confidential information, proprietary information, inventions (whether or not patentable), discoveries, business methods, trade secrets, trademarks, service marks, trade names, copyrights, patents (and all registrations of and applications for any of the foregoing and rights therein), originals of all trademark registrations and patents and pending patent and trademark applications wherever located and all other intellectual and intangible property rights, discoveries, business methods and trade secrets owned by Seller or to or in which Seller has any

right or interest whatsoever (collectively, "Intellectual Property"), including, without limitation, the intellectual and intangible property rights described on the Schedule entitled "Intellectual Property" that Seller will provide to Buyer at Closing;

(1) <u>Contracts</u>. All of Seller's right, title, interest and benefits in, to or under licenses (including licenses of Intellectual Property), contracts, purchase orders, agreements, commitments and undertakings, whether oral or written, to which Seller is a party on the Closing Date or by which any of the Acquired Assets are bound ("Assumed Contracts"), including, without limitation, all rights of Seller under (i) all purchase and sales orders (including releases of quantities pursuant thereto), (ii) as lessee, all leases of personal property, (iii) all contracts with suppliers for any products, raw materials, supplies, equipment or parts heretofore sold, or to be sold, by Seller, (iv) any licenses, joint venture, partnership and similar agreements or arrangements, (v) all express or implied warranties given from suppliers and contractors and (vi) all contracts listed on the Schedule entitled "Contracts" attached hereto;

(m) <u>Permits and Approvals</u>. All licenses, franchises, permits, approvals, variances, authorizations, waivers, certifications, qualifications, consents or similar documents or authority to the extent transferable (including those relating to the sale or use of the Company's products) (collectively "Licenses"), including, without limitation, those listed on the Schedule entitled "Permits and Approvals" attached hereto, issued to Seller, or in which Seller maintains an interest, by any United States, foreign, state or local governmental entity or municipality or subdivision thereof or any authority, department, commission, board, bureau, agency, court or instrumentality (collectively, "Governmental Authorities");

(n) <u>Goodwill and Trade Names</u>. Any and all business and goodwill of Seller through the operation of or otherwise associated with the Business, including, without limitation, any corporate names and any trade names used by Seller at any time prior to the Closing Date;

(o) <u>Claims Against Third Parties</u>. All of Seller's causes of action, judgments, claims, rights and demands of whatever nature, whenever occurring and whenever claims therefor mature or are asserted, that are based in whole or in part on events or conditions occurring or existing in connection with, arising out of, resulting from or relating to, directly or indirectly, the Business, the Acquired Assets or the Assumed Liabilities; and

(p) <u>Insurance Policies and Claims</u>. All insurance policies and programs, reserves and bonds of Seller of any nature whatsoever, all prepaid expenses, relating thereto and all rights of Seller to insurance claims and proceeds therefrom.

1.2 <u>Retained Assets</u>. Notwithstanding anything to the contrary in this Agreement, Seller shall retain, and Buyer shall not acquire, the following assets, properties, rights and interests which shall not be included in the Acquired Assets (collectively, the "Retained Assets"):

(a) <u>Certain Contracts</u>. Those certain contracts and agreements identified on the Schedule entitled "Retained Contracts" (collectively, the "Retained Contracts");

(b) <u>Cash and Cash Equivalents</u>. All cash on hand or on deposit in banks, certificates of deposit, time deposits, securities and similar cash equivalent items of Seller; and

(c) <u>Other Retained Assets</u>. Those certain assets, properties, rights and interests, if any, specifically described on the Schedule entitled "Other Retained Assets" attached hereto.

1.3 <u>Assignability and Consents</u>. Notwithstanding anything to the contrary in this Agreement, this Agreement shall not constitute an agreement to assign any order, contract, agreement, lease, commitment, License, franchise, permit, authorization or concession (collectively, the "Assigned Agreements") if an attempted assignment thereof, without the consent of another party thereto or any Governmental Authority, would constitute a breach of any such Assigned Agreement or in any way affect the rights of Seller thereunder. Seller shall use its best efforts to obtain all consents, novations and waivers and to resolve all impracticalities of assignments, novations or transfers necessary to convey the Assigned Agreements to Buyer at the earliest practicable date. If such consents, novations or waivers are not obtained, or if an attempted assignment would be ineffective, Seller shall use its best efforts to provide to Buyer the benefits of any such Assigned Agreement, shall enforce, at Buyer's request and for Buyer's account, any rights of Seller under such Assigned Agreement (including the right to elect, renew, extend or terminate), and shall promptly pay to Buyer when received all monies received by Seller under such Assigned Agreement. To the extent Buyer is provided the benefit of any such Assigned Agreement, Buyer shall perform or discharge on behalf of Seller, Seller's obligations and liabilities under each such Assigned Agreement in accordance with the provisions thereof. This Section 1.3 shall not be construed to require Buyer to assume any additional liability hereunder or to perform under or assume any obligations with respect to the Assigned Agreements in excess of those currently required by such Assigned Agreements. Seller shall use its best efforts to ensure that all

Contracts entered into by Seller after the date hereof are assignable to Buyer without the consent of the other party thereto.

## ARTICLE II.   RETENTION OF LIABILITIES

2.1  **Retention of Liabilities**.  Except as otherwise provided in Section 2.2, at the Closing, Seller and the Stockholders shall retain, and Buyer shall not assume, or be responsible or liable with respect to, any liabilities and obligations of Seller or the Stockholders whether or not relating to the Business or the Acquired Assets, whether fixed, contingent or otherwise, whether known or unknown and whether incurred prior to, at or subsequent to the Closing Date (collectively, the "Retained Liabilities").  Without limiting the generality of the foregoing, the Retained Liabilities shall include the following:

(a)  **Pre-Closing Date**.  All claims, liabilities and obligations, including, without limitation, claims, liabilities and obligations that are based in whole or in part on events or conditions occurring or existing in connection with, arising out of, resulting from or relating to, directly or indirectly, the Business prior to the Closing Date, or the ownership, possession, use or sale of the Acquired Assets prior to the Closing Date, except those certain claims, liabilities and obligations specifically identified and set forth on the Closing Balance Sheet (as defined in Section 3.2);

(b)  **Liabilities Relating to the Sale of Acquired Assets**.  Any claim, liability or obligation of Seller, its Affiliates (as defined in Section 11.12) or any of their respective directors, officers, stockholders, agents or employees, arising out of, or relating to, this Agreement or the transactions contemplated hereby, including, without limitation, any and all finder's or broker's fees and expenses and any and all fees and expenses of Seller's attorneys, accountants or investment advisors;

(c)  **Liabilities Relating to Retained Assets**.  Any claim, liability or obligation that is based in whole or in part on events or conditions occurring or existing in connection with, or arising out of, resulting from or relating to, directly or indirectly, the Retained Assets;

(d)  **Taxes**.  Any liability or obligation of Seller or the Stockholders or their respective Affiliates for any Taxes (as defined in Section 6.1(o)) except for those Taxes specifically identified and set forth on the Closing Balance Sheet, which Taxes shall not include any Taxes relating to income, capital gains, net worth or similar Taxes;

(e) <u>Employees</u>. Any claim, liability or obligation due any of Seller's current or former employees, agents, independent contractors or other persons providing services to Seller, the Stockholders or any of their respective Affiliates, including, without limitation, claims, liabilities or obligations relating to the Plans (as defined in Section 6.1(z)), claims for injury, sickness, disease or death of any person, accrued wages, severance, bonus, retirement, pension, profit-sharing or deferred compensation plans or agreements or holiday, vacation or health benefits, except for any such claim, liability or obligation specifically identified and to the extent set forth on the Closing Balance Sheet or expressly assumed by Buyer pursuant to Section 2.2(c); provided, however, that notwithstanding anything to the contrary in this Agreement, Seller shall retain, and Buyer shall not assume, any such claims, liabilities and obligations relating to Brian Smith and the employees listed on the Schedule entitled "Employees" attached hereto reflected as "FAMILY";

(f) <u>Litigation</u>. Any liability or obligation relating to any claim, suit, litigation, proceeding or investigation pending on the date hereof, or instituted hereafter, that is based in whole or in part on events or conditions occurring or existing in connection with, arising out of, resulting from or relating to, directly or indirectly, the operation of the Business prior to the Closing Date, or the ownership, possession, use or sale of the Acquired Assets prior to the Closing Date;

(g) <u>Product, Environmental and Safety Liability</u>. Any claim, liability or obligation (including, without limitation, fines, penalties, punitive damages, legal fees and expenses and all other damages and losses), irrespective of the actual or alleged basis therefor, that is based in whole or in part on events or conditions occurring or existing prior to the Closing in connection with, arising out of, resulting from or relating to, directly or indirectly, (i) Product Claims (as defined in Section 6.1(r)), (ii) any applicable laws regulating or establishing quality criteria or standards for air, water, land, noise or industrial safety and health, providing for remediation of environmental conditions or otherwise relating to the environment, whether existing as of the date hereof or subsequently amended, enacted or promulgated, (iii) employee health and safety or (iv) compliance with any laws or regulations relating to any of the foregoing;

(h) <u>Shutdown Costs</u>. Any claims, liabilities or obligations that are based in whole or in part on events or conditions occurring or existing in connection with, arising out of, resulting from or relating to, directly or indirectly, the shutdown of the manufacturing operations and facilities utilized by Seller in connection with the

Business, including, without limitation, any action which could be construed as a "plant closing", "mass layoff" or "employment loss" as defined in the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101-2109 ("WARN") which any employee may suffer or may be deemed to suffer;

(i) <u>Breach of Agreement</u>. Any claim, liability or obligation, the existence of which is a breach of, or inconsistent with, any representation, warranty, covenant, obligation or agreement of Seller or the Stockholders set forth in this Agreement; and

(j) <u>Post-Closing</u>. Any liability or obligation incurred by Seller or its directors, officers, stockholders, agents or employees or the Stockholders or any of their respective Affiliates after the Closing.

2.2 <u>Assumption of Liabilities</u>. To the extent that such liability is not inconsistent with any representation, warranty or covenant of Seller or the Stockholders, at the Closing, Buyer shall assume the following liabilities and obligations of Seller, which shall not be included in the Retained Liabilities (collectively, the "Assumed Liabilities"):

(a) <u>Assumed Contracts</u>. All accrued liabilities and obligations of Seller (i) which constitute ordinary and normal course of business trade payables due to suppliers as payment for Inventory included in the Acquired Assets as of the Closing and (ii) under the Assumed Contracts included in the Acquired Assets and acquired by Buyer pursuant to Section 1.2 and accrued on the Initial Balance Sheet and the Closing Balance Sheet, exclusive, however, of any such liabilities or obligations thereunder (A) arising from breaches thereof or defaults thereunder by Seller or (B) any accrued liabilities of Seller, the Stockholders or any of their respective Affiliates, which liabilities and obligations shall constitute Retained Liabilities;

(b) <u>Balance Sheet Liabilities</u>. The liabilities and obligations of Seller set forth on the Initial Balance Sheet less payments thereon or discharges thereof prior to the Closing Date and on the Closing Balance Sheet, and, in each case, otherwise in accordance with the terms of this Agreement;

(c) <u>Employee Severance Obligations</u>. The severance obligations of Seller arising by reason of the termination on or after the Closing of the employment of any employee employed by Seller in the Business immediately prior to Closing, to the extent such severance obligations are specifically identified and set forth on the Schedule entitled "Employee Benefits" attached hereto; provided, however, that any severance obligations to any employee rehired by Buyer arising by reason of the sale of the

Business and the Acquired Assets pursuant to this Agreement shall remain the sole liability of Seller and shall constitute Retained Liabilities;

(d)  *Employee Sick Days, Vacation Days*. The obligations of Seller relating to vacation days and sick days accumulated by employees of Seller employed in the Business, specifically identified and set forth on the Schedule entitled "Employees" attached hereto and with respect to vacation days, to the extent accrued on the Initial Balance Sheet; provided, however, that Buyer shall not have any obligation to make any payments to any employee with respect to accumulated sick days and any such obligations shall constitute Retained Liabilities; and

(e)  *Other Assumed Liabilities*. The liabilities listed on the Schedule entitled "Other Assumed Liabilities" attached hereto.

## ARTICLE III.  PURCHASE PRICE

3.1  *Payment*. In full consideration for the transfer of the Acquired Assets, Buyer shall deliver and pay (i) to Seller, on the Closing Date, four million nine hundred fifty-six thousand five hundred and forty-three dollars ($4,956,543.00) (the "Initial Net Asset Amount") plus one million two hundred thousand dollars ($1,200,000.00) (together with the Initial Net Asset Amount, the "Initial Purchase Price Amount") payable by wire transfer of immediately available same day funds to such bank account as Seller shall designate in writing at least one business day prior to the Closing Date, (ii) to the Escrow Agent (as defined in Section 3.3), on the Closing Date, the Escrow Amount (as defined in Section 3.3), (iii) to Seller, on or before the Final Payment Date (as defined in Section 3.2), the amount of the adjustment, if any, under Section 3.2 payable by wire transfer of immediately available same day funds to such bank account as Seller shall designate in writing at least one business day prior to the Final Payment Date and (iv) to Seller, on or before the Earn-Out Payment Date (as defined in Section 3.4), the Earn-Out Amount (as defined in Section 3.4) payable by wire transfer of immediately available same day funds to such bank account as Seller shall designate in writing at least one business day prior to the Earn-Out Payment Date (collectively, the "Purchase Price").

3.2  *Post-Closing Balance Sheet and Adjustment of Purchase Price*.

(a)  *Closing Balance Sheet*. Not later than 30 days after the Closing Date, Buyer, with the assistance of Coopers & Lybrand LLP, shall prepare and submit to Seller a balance sheet reflecting the Acquired Assets and Assumed Liabilities as of the Closing Date (the "Closing Balance

Sheet"). For such purpose, Seller shall afford Buyer and Buyer's agents and representatives reasonable access to all books, records and work papers used by Seller to prepare the Initial Balance Sheet or otherwise necessary to Buyer to prepare the Closing Balance Sheet that are in Seller's possession or control. In connection with the preparation of the Closing Balance Sheet, Buyer shall undertake a physical count of all inventory included in the Acquired Assets. Seller shall have the right to observe the physical inventory or to have the physical inventory observed by public accountants of its choosing. In preparing the Closing Balance Sheet, the value of any Accounts Receivable included on the Initial Balance Sheet, specifically set forth on the Schedule entitled "Accounts Receivable" attached hereto and outstanding on the Closing Date shall be valued, for purposes of preparing the Closing Balance Sheet, in an amount equal to the value attributed to such Accounts Receivable in preparation of the Initial Balance Sheet after deducting any amounts received on any such Accounts Receivable and making appropriate adjustment for any counterclaim or setoff raised or asserted for the first time after the Balance Sheet Date. In addition, Buyer and Seller agree that, for purposes of preparing the Closing Balance Sheet, the bad debt reserve of $50,000 attributable to such Accounts Receivable is deemed to be an adequate reserve for such Accounts Receivable. The Closing Balance Sheet shall be prepared from the books and records kept by Seller and included in the Acquired Assets, shall fairly present the Acquired Assets and the Assumed Liabilities as of the Closing Date and, except as described in the two immediately preceding sentences, shall be prepared in accordance with generally accepted accounting principles ("GAAP") applied on a basis consistent with the Initial Balance Sheet. The value of the Acquired Assets less the value of the Assumed Liabilities shall be the "Net Asset Value."

(b) <u>Review of Balance Sheet</u>. Seller shall have 20 days from the date of the submission of the Closing Balance Sheet in which to review the Closing Balance Sheet and the Net Asset Value calculation (such period, the "Balance Sheet Review Period"). For such purpose, Buyer shall afford Seller and Seller's agents and representatives reasonable access to all books, records and work papers used by Buyer to prepare the Closing Balance Sheet or otherwise necessary to Seller to conduct its review of the Closing Balance Sheet that are in Buyer's possession or control. If, in Seller's reasonable judgment, the Closing Balance Sheet (or the Net Asset Value calculation derived therefrom) does not fairly present the Acquired Assets and Assumed Liabilities (or the Net Asset Value) as of the Closing Date on a basis consistent with the Initial Balance Sheet and, except as described in the fifth and sixth sentences of Section 3.2(a) above, according to GAAP applied on a basis consistent with the Initial Balance Sheet, Seller shall have the right to

propose any adjustment thereto within the Balance Sheet Review Period. Buyer and Seller shall use their best efforts for 20 days after the expiration of the Balance Sheet Review Period to agree upon any such proposed adjustments. Any dispute as to the content or preparation of the Closing Balance Sheet (or the Net Asset Value calculation derived therefrom) that is not resolved by Buyer and Seller during such 20-day period shall, if either Buyer or Seller by notice to the other party so requests, be submitted for resolution in accordance with the provisions of this Agreement to an independent certified public accounting firm unassociated with either Buyer or Seller (the "Expert"). The decision of the Expert shall be final and binding on Buyer and Seller in the absence of manifest error. The fees of the Expert associated with rendering such decision shall be shared by Buyer and Seller as follows: Each such party shall bear that portion of such fee equal to such fee multiplied by a fraction, the numerator of which shall be the difference between the Net Asset Value as determined by the Expert and the Net Asset Value proposed by the party, and the denominator of which shall be the difference between the Net Asset Value proposed by Buyer and the Net Asset Value proposed by Seller.

(c) <u>Adjustment of Purchase Price</u>. If and to the extent the Net Asset Value as determined in accordance with this Section 3.2 is less than the Initial Net Asset Amount by $250,000 or less, the Purchase Price shall be reduced by, and the Escrow Agent shall pay to Buyer from the Escrow Amount, cash in an amount equal to such shortfall and the Escrow Agent shall pay to Seller from the Escrow Amount any amount remaining in the Escrow Amount in excess of $250,000. If and to the extent the Net Asset Value as determined by this Section 3.2 is less than the Initial Net Asset Amount by more than $250,000, the Purchase Price shall be reduced by such amount and the Escrow Agent shall pay $250,000 in cash to Buyer from the Escrow Amount, and Seller shall pay to Buyer cash in an amount equal to the difference between such shortfall and $250,000. If and to the extent the Net Asset Value as determined in accordance with this Section 3.2 exceeds the Initial Net Asset Amount, the Purchase Price shall be increased by, and Buyer shall pay to Seller, cash in an amount equal to such excess and the Escrow Agent shall pay to Seller from the Escrow Amount any amounts remaining in the Escrow Amount in excess of $250,000. All payments required to be made pursuant to this Section shall be made within five days of the later of (i) the expiration of the Balance Sheet Review Period and (ii) the earlier of the date on which the parties agree on any such proposed adjustment and the date on which the decision of the independent certified public accounting firm is rendered (the "Final Payment Date"). To the extent payments are required to be made pursuant to this Section 3.2(c) out of the Escrow Amount, Buyer and Seller shall deliver joint instructions to

the Escrow Agent with respect thereto on or before the Final Payment Date.

3.3  **Escrow Arrangement**.  At the Closing, Buyer shall deliver to LaSalle National Trust, N.A. (the "Escrow Agent"), pursuant to an Escrow Agreement substantially in the form of Exhibit A hereto (the "Escrow Agreement") five hundred thousand dollars ($500,000.00) as a portion of the Purchase Price (together with any investment earnings thereon, the "Escrow Amount"), to be held by the Escrow Agent in accordance with the provisions of the Escrow Agreement and Section 3.2.

3.4  **Earn-Out Income Statement and Earn-Out Payment**.

(a)  **Earn-Out Income Statement**.  Not later than August 31, 1995, Buyer, with the assistance of Coopers & Lybrand LLP, shall prepare and submit to Seller an income statement of the Business for the period commencing on the Closing Date and ending on July 31, 1995 (the "Earn-Out Income Statement").  The value of the amount of net income set forth on the Earn-Out Income Statement shall be the "Net Income Value."  It is understood and agreed by the parties that, for purposes of this Section 3.4, the Earn-Out Income Statement shall (i) be prepared on a basis consistent with the Interim Income Statements (as defined in Section 6.1(f)) in accordance with GAAP and using consistent accounting methods, policies, practices and procedures with consistent classifications and valuations and estimation methodologies used therein, (ii) fairly present the financial results and the financial condition for the periods set forth therein and (iii) exclude any allocation of corporate overhead or inter- or intra-company accounts between Buyer, as presently constituted, and the Business.

(b)  **Review of the Earn-Out Income Statement and the Earn-Out Payment**.

(i)  **Review of the Earn-Out Income Statement**.  Seller shall have 20 days from the date of the submission of the Earn-Out Income Statement in which to review the Earn-Out Income Statement and the Net Income Value calculation (such period, the "Income Statement Review Period").  For such purpose, Buyer shall afford Seller and Seller's agents and representatives reasonable access to all books, records and work papers used by Buyer to prepare the Earn-Out Income Statement or otherwise necessary to Seller to conduct its review of the Earn-Out Income Statement that are in Buyer's possession or control.  If, in Seller's reasonable judgment, the Earn-Out Income Statement (or the Net Income Value calculation derived therefrom) does not fairly present the net income for the period commencing on the Closing Date and ending on July 31, 1995 on a basis consistent with the Interim Income Statements and

according to GAAP applied on a basis consistent with the Interim Income Statements, Seller shall have the right to propose any adjustment thereto within the Income Statement Review Period. Buyer and Seller shall use their best efforts for 20 days after the expiration of the Income Statement Review Period to agree upon any such proposed adjustments. Any dispute as to the content or preparation of the Earn-Out Income Statement (or the Net Income Value calculation derived therefrom) that is not resolved by Buyer and Seller during such 20-day period shall, if either Buyer or Seller by notice to the other party so requests, be submitted for resolution in accordance with the provisions of this Agreement to an independent certified public accounting firm unassociated with either Buyer or Seller (the "Income Statement Expert"). The decision of the Income Statement Expert shall be final and binding on Buyer and Seller. The fees of the Income Statement Expert associated with rendering such decision shall be shared by Buyer and Seller as follows: Each such party shall bear that portion of such fee equal to such fee multiplied by a fraction, the numerator of which shall be the difference between the Net Income Value as determined by the Income Statement Expert and the Net Income Value proposed by the party, and the denominator of which shall be the difference between the Net Income Value proposed by Buyer and the Net Income Value proposed by Seller.

(ii) *Earn-Out Payment*. Within five days of the later of (A) the expiration of the Income Statement Review Period and (B) the earlier of the date on which the parties agree on any such proposed adjustment and the date on which the decision of the Income Statement Expert is rendered (the "Earn-Out Payment Date"), Buyer shall pay to Seller the lesser of $200,000 or one-half of the Net Income Value (such payment, the "Earn-Out Payment").

3.5 *Allocation of Purchase Price*. The sum of the Purchase Price payable pursuant to Sections 3.1, 3.2, 3.3 and 3.4 and the Assumed Liabilities represents the amount agreed upon by the parties to be the value of the Acquired Assets, it being further agreed among the parties that the Purchase Price and the Assumed Liabilities shall be allocated among the Acquired Assets in accordance with Exhibit B. Each of the parties shall report the purchase and sale of the Acquired Assets in accordance with such Exhibit for all Tax purposes. Any subsequent allocations necessary as a result of adjustments to the consideration paid hereunder shall be made in a manner consistent with such Exhibit.