## ARTICLE IV. CLOSING

4.1 **General**. As used in this Agreement, the term "Closing" shall mean the time at which (a) Seller consummates the sale, assignment, transfer and delivery of the Acquired Assets to Buyer by delivery of the documents referred to in Section 4.2, (b) Buyer pays the Initial Purchase Price Amount to Seller and the Escrow Agent as provided in Section 3.1 and (c) Buyer assumes the Assumed Liabilities. "Closing Date" means and refers to the date on which the Closing occurs. The Closing shall take place at the offices of Jones, Day, Reavis & Pogue, 77 West Wacker, Chicago, Illinois 60601-1692 or such other place as may be mutually agreed upon by the parties on such date as may be mutually agreed upon by the parties but in any event no later than May 31, 1995, provided that in the event either party reasonably requests, such date may be extended up to a date not later than June 15, 1995.

4.2 **Documents Delivered by Seller and the Stockholders**. At the Closing or at such other time as specified herein, in connection with the sale of the Acquired Assets, Seller and the Stockholders shall deliver to Buyer:

(a) **Resolutions and Incumbency Certificate**. Copies of (i) the resolutions of the Board of Directors of Seller and the stockholders of Seller authorizing and approving this Agreement and all other transactions and agreements contemplated hereby and (ii) an incumbency certificate of the appropriate officers of Seller, both certified by the Secretary or an Assistant Secretary of Seller, delivered to Buyer simultaneously with the execution of this Agreement;

(b) **Documents of Transfer**. Bills of sale, deeds of assignment and releases, if required, transferring the Acquired Assets to Buyer, free and clear of any and all liens, equities, claims, prior assignments, mortgages, charges, security interests, pledges, restrictions or encumbrances whatsoever (collectively, "Liens") except for Permitted Liens (as defined in Section 6.1(b));

(c) **Legal Opinion**. An opinion of counsel for Seller, dated as of the Closing Date, addressed to Buyer, in substantially the form attached hereto as Exhibit C;

(d) **Consents and Notice**. Copies of all consents, approvals and authorizations which by the terms of this Agreement are required to be obtained or satisfied by Seller or the Stockholders to transfer the Acquired Assets, including, without limitation, such consents, approvals and authorizations described on the Schedule entitled "Consents" attached hereto;

(e) [Intentionally omitted];

(f) <u>Assignment of Intellectual Property</u>. Instruments of assignment in recordable form to Buyer of all Intellectual Property;

(g) <u>Certificates of Title</u>. Certificates of title with respect to owned motor vehicles that constitute part of the Acquired Assets;

(h) <u>Releases</u>. Releases, including without limitation, termination statements under the Uniform Commercial Code of any financing statements filed against any Acquired Asset, to the extent applicable, evidencing the discharge and removal of all Liens to which the Acquired Assets, to the extent applicable, are subject and releases evidencing the discharge and removal of all other Liens that are not Permitted Liens;

(i) <u>Good Standing Certificates</u>. A long-form good standing certificate for Seller from the Secretary of State of the State of Florida and long-form good standing and tax certificates for Seller from the appropriate state and tax authorities in which Seller is qualified to do business as a foreign corporation, dated not more than ten days prior to the Closing;

(j) <u>Employment, Confidentiality and Non-Competition Agreements</u>. Employment, Confidentiality and Non-Competition Agreements, dated not later than the Closing Date, executed by Mr. Martin A. Smith ("Martin's Agreement") and Ms. Judith Smith ("Judith's Agreement") in form and substance reasonably satisfactory to Mr. Martin A. Smith and Ms. Judith Smith, respectively and Buyer; provided, however, that notwithstanding anything to the contrary herein, such agreements shall provide for fringe benefits during the term of employment consistent with the type and amount historically provided by Seller, subject to any adjustments thereto necessary to provide coverage to such employee under Buyer's fringe benefits plans and shall contain covenants relating to confidentiality and non-competition, Martin's Agreement shall provide for a salary of $167,000 for a one-year term and Judith's Agreement shall provide for a salary of $20,000 per year until April 18, 2001;

(k) <u>Other Documents</u>. Such other deeds, bills of sale, endorsements, assignments, affidavits and other good and sufficient instruments of sale, assignment, conveyance and transfer, in form and substance satisfactory to Buyer and its counsel, as are required to effectively vest in Buyer all of Seller's right, title and interest in and to all of the Acquired Assets, free and clear of any and all Liens except for Permitted Liens;

(l) <u>Certificate</u>. A certificate executed by the Chief Executive Officer or the President of Seller dated the

Closing Date to the effect that (i) all of the conditions specified in Section 5.1 have been fulfilled, and (ii) any consents, approvals, authority and other requirements prescribed by any law, rule or regulation which must be obtained or satisfied by Seller and which are necessary for the consummation of the transactions contemplated by this Agreement and the related transactions have been obtained and satisfied, which certificate shall be deemed to make representations and warranties as to the matters set forth therein;

(m)   Intellectual Property Documentation. All written documentation relating to any Intellectual Property; and

(n)   Schedules Entitled "Customer List" and "Intellectual Property". The Schedules entitled "Customer List" and "Intellectual Property," which Schedules are substantially identical to the draft Schedules previously delivered to Buyer under cover of letter dated as of April 28, 1995.

4.3   Payments and Documents Delivered by Buyer. At the Closing, Buyer shall deliver to Seller:

(a)   Resolutions and Incumbency Certificate. Copies of (i) resolutions of the Board of Directors of Buyer authorizing and approving this Agreement and all other transactions and agreements contemplated hereby and (ii) an incumbency certificate of the appropriate officers of Buyer, both certified by the Secretary or an Assistant Secretary of Buyer, delivered to Seller simultaneously with the execution of this Agreement;

(b)   Assumption Agreement. An instrument of assumption of the Assumed Liabilities in a form consistent with the terms of Article II;

(c)   Legal Opinion. An opinion of Jones, Day, Reavis & Pogue, dated as of the Closing Date, addressed to Seller substantially in the form attached hereto as Exhibit D;

(d)   Certificate. A certificate executed by the President or a vice president of Buyer dated the Closing Date to the effect that (i) all of the conditions specified in Section 5.2 have been fulfilled, and (ii) any consents, approvals, authority and other requirements prescribed by any law, rule or regulation which must be obtained or satisfied by Buyer and which are necessary for the consummation of the transactions contemplated by this Agreement and the related transactions have been obtained and satisfied, which certificate shall be deemed to make representations and warranties as to the matters set forth therein; and

(e) <u>Initial Purchase Price Amount</u>. The Initial Purchase Price Amount.

4.4 <u>Documents Delivered by Buyer and Seller</u>. At the Closing, the following additional document shall be executed and delivered:

(a) <u>Escrow Agreement</u>. The Escrow Agreement executed by Buyer, Seller and the Escrow Agent.

## ARTICLE V.  CONDITIONS

5.1 <u>Conditions to Buyer's Obligations</u>. The obligation of Buyer to consummate the transactions provided for by this Agreement is subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived by Buyer (except for the conditions set forth in Section 5.1(d) and (f)):

(a) <u>Representations and Warranties</u>. All representations and warranties of Seller and the Stockholders made in Section 6.1 shall be true and correct as of the Closing Date as though made at such time (except for those representations or warranties specifically made as of a particular date) other than changes permitted by this Agreement or approved in writing by Buyer;

(b) <u>Covenants</u>. Seller shall have performed in all material respects all covenants and agreements required by this Agreement to be performed by it prior to the Closing Date;

(c) <u>Absence of Material Adverse Change</u>. Since the date hereof there shall have been no material adverse change, or discovery of a condition or occurrence of any event that might result in any such change in the properties, assets, liabilities, business or prospects of Seller, the Acquired Assets or the Business;

(d) <u>Consents</u>. All consents, notices and approvals of Governmental Authorities and third parties (including all required notices under bulk sales laws) necessary to consummate the transactions contemplated hereunder shall have been given and obtained;

(e) <u>No Proceeding or Litigation</u>. No litigation, action, suit or proceeding challenging the legality of the transactions provided for in this Agreement shall have been instituted or threatened and not settled or otherwise terminated on terms and conditions satisfactory to Buyer;

 (f) *Filings*. All filings required to be made under any laws, rules and regulations of Governmental Authorities shall have been made;

 (g) *Certificates; Documents*. Seller and the Stockholders shall have delivered the certificates, opinions of counsel and other documents required by Sections 4.2 and 4.4;

 (h) *Consent of Buyer's Lenders*. All consents and approvals of Buyer's lenders shall have been obtained; and

 (i) *Bulk Sales Compliance*. Seller shall have delivered the Bulk Sales Affidavit (as defined in Section 6.1(dd)) and evidence of compliance with any and all laws relating to bulk transfers that may apply in connection with the transfer of the Business and the Acquired Assets to Buyer.

 5.2 *Conditions to Seller's Obligations*. The obligation of Seller to consummate the transactions provided for by this Agreement is subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived by Seller (except for the conditions set forth in Section 5.2(c) and (e)):

 (a) *Representations and Warranties*. All representations and warranties of Buyer made in Section 6.2 shall be true and correct in all material respects as of the Closing Date as though made at such time (except for those representations and warranties specifically made as of a particular date) other than changes permitted by this Agreement or approved in writing by Seller;

 (b) *Covenants*. Buyer shall have performed in all material respects all covenants and agreements required by this Agreement to be performed by it prior to the Closing Date;

 (c) *Consents*. All consents and approvals of Governmental Authorities necessary to consummate the transactions contemplated hereunder shall have been obtained;

 (d) *No Proceeding or Litigation*. No litigation, action, suit or proceeding challenging the legality of the transactions provided for in this Agreement shall have been instituted or threatened and not settled or otherwise terminated on terms and conditions satisfactory to Seller;

 (e) *Filings*. All filings required to be made under any laws, rules and regulations of Governmental Authorities shall have been made; and

(f)  <u>Certificates; Documents</u>.  Buyer shall have delivered the certificates, opinions of counsel and other documents required by Sections 4.3 and 4.4.

## ARTICLE VI.  REPRESENTATIONS AND WARRANTIES

6.1  <u>Representations and Warranties of Seller and the Stockholders</u>.  Seller and each of the Stockholders, jointly and severally, represent and warrant to Buyer that, except as set forth in the Schedules to this Agreement:

(a)  <u>Organization and Standing; Power and Authority</u>.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida, and has full corporate power and authority to own, lease or operate the Acquired Assets, to carry on the Business as now being conducted, to make and perform this Agreement and to perform the transactions contemplated hereby.  Seller is duly qualified to do business and is in good standing in each jurisdiction in which the property owned, leased or operated by it in connection with the Business, or the nature of the Business conducted by it, makes such qualification necessary, except where the failure to so qualify would not have a Material Adverse Effect.  "Material Adverse Effect" in this Section 6.1(a) shall mean that the events or circumstances in question are reasonably likely to have a negative impact on the Business equal to or greater than $25,000.  Seller has no subsidiary corporation and does not own any interest, directly or indirectly, in any other business enterprise, firm or corporation.  The Schedule entitled "Stockholders of Seller" attached hereto sets forth a true, correct and complete list of each of the stockholders of Seller and each of their respective holdings of any capital stock of Seller and no other person or entity owns any equity interest in Seller.  This Agreement (and the transactions contemplated hereby) has been duly approved by the Stockholders, constituting at least 85% of the voting capital stock of Seller, and the Board of Directors of Seller and constitutes the valid, binding and enforceable obligation of Seller and the Stockholders.  Each of the Stockholders has full capacity, authority and right to execute and deliver this Agreement and perform the transactions contemplated hereby.

(b)  <u>Assets; Good Title</u>.  Seller has good and marketable title to, or has the right to use and transfer to Buyer, each of the Acquired Assets and such Acquired Assets are free and clear of all Liens of any kind or nature whatsoever except for Permitted Liens.  For purposes of this Agreement, "Permitted Liens" shall mean (i) liens for current taxes, assessments or other governmental charges, both general and special, which are not due or delinquent and (ii) such items as are set forth on the Schedule

entitled "Liens" attached hereto and noted thereon as Permitted Liens and Liens identified on such Schedule with respect to which termination statements shall be delivered to Buyer at Closing. The delivery to Buyer of the instruments of transfer of ownership contemplated by this Agreement will vest good, marketable and exclusive title to the Acquired Assets in Buyer, free and clear of all Liens and claims of any kind or nature whatsoever, except for Permitted Liens and Liens identified on such Schedule with respect to which termination statements shall be delivered to Buyer at Closing. The Acquired Assets constitute all of the assets necessary to conduct the Business in substantially the same manner as conducted by Seller as of the date of this Agreement and are in good operating condition and repair, subject to normal wear and tear consistent with the age and use of the assets. Seller is the owner of, and has the right to convey to Buyer, all rights necessary to advertise, promote, sell and distribute the Inventory.

(c) <u>Conflicts; Defaults</u>. Neither the execution and delivery of this Agreement by Seller, nor the performance of any of Seller's or the Stockholder's obligations hereunder or the transactions contemplated hereby, will (i) violate, conflict with, breach or constitute a default under any of the terms of any charter or constitutional documents of Seller or any provisions of, or result in the acceleration, or rights of termination or cancellation, of any obligation under, any material contract or agreement or any order, judgment or decree relating to the Business or otherwise binding on Seller or any Stockholder, (ii) result in the creation or imposition of any Lien in favor of any third person or entity upon any of the Acquired Assets, (iii) conflict with or violate any law, statute, judgment, decree, order, rule or regulation of any Governmental Authority applicable to Seller, the Stockholders, the Acquired Assets or the Business or (iv) constitute an event which, after notice or lapse of time or both, would result in such violation, conflict, default, acceleration or creation of or imposition of any Lien.

(d) <u>Contracts</u>. The Schedule entitled "Contracts" attached hereto contains a complete list of all contracts, agreements, licenses and commitments, written or oral, relating to the Business to which Seller is a party, (i) with a remaining term of more than six months, (ii) that involve an expenditure in a dollar amount in excess of $25,000 or, in the case of open purchase orders for the sale of goods or services by Seller, that involve a dollar amount in excess of $100,000, (iii) that involve the provision of services by an employee or a consultant to Seller or (iv) that restrict the ability of Seller to compete in the Business (collectively, the "Contracts"), except for those agreements and contracts listed on the Schedule entitled

"Retained Contracts" attached hereto. Except as identified on the Schedule entitled "Contracts," Seller has not breached or improperly terminated any such Contract and is not in default under any Contract. Seller has delivered to Buyer true, correct and complete copies of all Contracts, including all amendments and modifications thereto. Each Contract constitutes a valid, binding and enforceable obligation of Seller. No notice of cancellation or alleged default under any Contract has been received by Seller. To the best knowledge of Seller and the Stockholders, no other party to any Contract is in default or has breached any such Contract, and Seller and the Stockholders know of no condition or event which, after notice or lapse of time or both, would constitute a default or breach by any party. Except as disclosed on the Schedule entitled "Contracts," each Contract may be assigned to Buyer without any consent of any other party thereto.

(e) Facilities. Seller does not own, in whole or in part, any real property. The Schedule entitled "Leases" attached hereto is a true, correct and complete list of all of the real properties leased by Seller and used in the Business (the "Facilities"). Seller has delivered or caused to be delivered true, correct and complete copies of all documents evidencing the lease of the Facilities. Seller enjoys peaceful and undisturbed possession under all such leases, all of such leases are valid and in full force and effect, neither Seller nor, to the best knowledge of Seller and the Stockholders, any other person is in default under any such leases and no event has occurred which with the giving of notice or the passage of time or both would constitute a default by Seller or, to the best knowledge of Seller and the Stockholders, any other person under any such leases. Seller has a valid and enforceable leasehold interest in all of the Facilities, free and clear of all Liens except Permitted Liens. Except as set forth on the Schedule entitled "Leases":

(i) to the best knowledge of Seller and the Stockholders, (a) no portion of such Facilities is subject to any pending condemnation proceeding or similar proceeding by any Governmental Authority materially adverse to the Facilities or the Business and (b) there is no such threatened proceeding with respect thereto;

(ii) the fixtures, machinery, equipment, computers and other tangible personal property owned, leased or used by Seller at or upon the Facilities, including, but not limited to, heating, ventilation and air conditioning systems, have to date been reasonably maintained and are in good operating condition for their intended use subject to the provision of usual and customary maintenance and repair performed in the

ordinary course of business with respect to similar properties of like age, construction and usage;

(iii) all Facilities are supplied with utilities and other services necessary for the operation of such Facilities as presently operated and all of such services are adequate to conduct that portion of the Business as presently conducted at each such Facility;

(iv) none of the Facilities is located in either a special service district or an area for which federal flood risk insurance is necessary;

(v) no notice of any increase in the assessed valuation of the Facilities and no notice of any contemplated special assessment has been received by Seller and, to the best knowledge of Seller and the Stockholders, there is no threatened special assessment pertaining to any of the Facilities;

(vi) there are no Contracts to which Seller is a party granting to any person the right of use or occupancy of any portion of the parcels of the Facilities; and

(vii) there are no persons (other than Seller) in possession of the Facilities.

(f) <u>Financial Statements</u>. Attached hereto as a Schedule entitled "Financial Statements" are (i) the balance sheets of the Business as of December 31, 1994 and 1993, the income statements of the Business for the twelve months ended December 31, 1994 and 1993 and the statements of cash flows of the Business for the twelve months ended December 31, 1994 and 1993 together with the notes thereto, all of which are in draft form (collectively, the "Draft Year-End Financial Statements"), (ii) the interim income statements for the three months ended March 31, 1995 and 1994 (the "Interim Income Statements") and the balance sheet (the "Interim Balance Sheet") as of March 31, 1995 (the "Balance Sheet Date") and the balance sheet as of March 31, 1994 of Seller (collectively, the "Interim Financial Statements") and (iii) the Initial Balance Sheet (as defined below). When delivered in final form, the "Year-End Financial Statements" (as defined in Section 7.7) will be substantially identical to the Draft Year-End Financial Statements except for the addition of references to this Agreement in the notes to such Year-End Financial Statements. The "Initial Balance Sheet" reflects the amounts set forth on the Interim Balance Sheet plus or less any adjustments thereto to exclude the Retained Assets and the Retained Liabilities, each of which, including the value attributable thereto, is specifically set forth on Schedule A to the Initial Balance Sheet. The Net Asset Value set

forth on the Initial Balance Sheet reflects the net value of the Acquired Assets and the Assumed Liabilities set forth on the Interim Balance Sheet. Except for adjustments as otherwise described therein or in the adjustments specifically described on Schedule A to the Initial Balance Sheet, the Interim Financial Statements and the Initial Balance Sheet, (i) were prepared on the same basis as the Year-End Financial Statements in accordance with GAAP and using the same accounting methods, policies, practices and procedures with consistent classifications and valuations and estimation methodologies as used therein and (ii) fairly present the financial results and the financial condition and the assets and liabilities of the Business for the periods and as of the dates set forth therein and with respect to the Initial Balance Sheet, fairly present the Acquired Assets and the Assumed Liabilities as of the Balance Sheet Date.

(g) <u>Liabilities</u>. To the best knowledge of Seller and the Stockholders, Seller has no material liabilities or obligations attributable to the Business of any nature whatsoever, whether absolute, accrued, contingent or otherwise, except for those (i) reflected or reserved on the Initial Balance Sheet and the notes thereto, (ii) incurred or accrued since the Balance Sheet Date in the ordinary and normal course of the Business consistent with past practice or (iii) set forth on the Schedule entitled "Liabilities" attached hereto.

(h) <u>Litigation</u>. Except as set forth on the Schedule entitled "Litigation" attached hereto, there exists no litigation, action, suit, claim, proceeding or investigation, pending at law or in equity, by any person or any arbitration or administrative or other proceeding by or before any Governmental Authority or, to the best knowledge of Seller and the Stockholders, threatened against Seller or which relates to the Business or the Acquired Assets or which are reasonably likely to adversely affect the Business, the Acquired Assets or the transactions contemplated by this Agreement.

(i) <u>Regulatory Compliance</u>. Except as set forth on the Schedule entitled "Regulatory Compliance" attached hereto, the Business has been conducted, and the Acquired Assets have been maintained, in substantial compliance with applicable laws, regulations and other requirements of Governmental Authorities and, with respect to the Business and the Acquired Assets, Seller is not currently in violation of any applicable laws, regulations or orders of any Governmental Authority, the enforcement of which would have a material adverse effect on the results of operations, condition (financial or otherwise), assets or properties of Seller, the Business or the Acquired Assets.

(j) <u>Customers and Suppliers</u>. The Schedule entitled "Customer List" that Seller will provide to Buyer at Closing will be a true, correct and complete list of all Customers and all suppliers to the Business during the preceding five years. Except as set forth on the Schedule entitled "Litigation" attached hereto, neither Seller nor any Stockholder is involved in any claim, dispute or controversy with any Customer of, or supplier to, the Business that has or is reasonably likely to have a material adverse effect on Seller, the Business or the Acquired Assets.

(k) <u>Brokers, Finders and Agents</u>. Seller is not directly or indirectly obligated to anyone acting as a broker, finder or in any other similar capacity in connection with this Agreement or the transactions contemplated hereby.

(l) <u>Intellectual Property</u>. The Schedule entitled "Intellectual Property" that Seller will provide to Buyer at Closing will set forth a complete list of all copyrights, inventions, patents, trademarks, product certification marks, service marks and trade names (and any applications for registration of any of the foregoing) owned by Seller relating to the Business and with respect to which registrations or patents have been obtained or for which registrations or patents have been applied. Seller has a license to use or otherwise has the right to use, free and clear of pending or threatened Liens, all of the Intellectual Property, and to make, use and sell all existing Products (as defined in Section 6.1(r)) free and clear of all claims of any third party's patents and free and clear of any claim of violation of any third party's trade secrets and has obtained all licenses and other rights of whatever nature, necessary for or appropriate to the present conduct of the Business, without, to the best knowledge of Seller and the Stockholders, any conflict with the rights of others. There is no litigation, action, suit, claim or proceeding (including any interference, opposition or cancellation proceedings) pending or, to the best knowledge of Seller and the Stockholders, threatened, which challenges the validity, enforceability, use or ownership of the Intellectual Property and, to the best knowledge of Seller and the Stockholders, there is no existing state of facts that would support a claim that use by Seller of any Intellectual Property has infringed or otherwise violated any proprietary right of any other person.

(m) <u>Collective Bargaining Agreements</u>. Seller is not a party to any collective bargaining or union contract. To the best knowledge of Seller and the Stockholders, there exists no current union organizational effort and no such efforts have been undertaken within the preceding five years with respect to any employees of Seller employed in connection with the Business.

(n)  <u>Changes in Circumstances</u>.  Except as disclosed on the Schedule entitled "Changes in Circumstances" attached hereto, since the Balance Sheet Date, Seller has not (i) sold, transferred or otherwise disposed of any fixed assets used in the Business having a value in excess of $10,000, (ii) otherwise sold, transferred or disposed of any of its properties or assets outside the ordinary and normal course of business, (iii) sustained any material damage, loss or destruction of or to the Business or Acquired Assets by reason of fire, explosion, earthquake, casualty, significant labor trouble, requisition or taking of property by any Governmental Authority, windstorm, embargo, riot, act of God or public enemy, flood, accident, other calamity or similar event (whether or not covered by insurance), (iv) entered into any transaction or otherwise conducted the Business in all material respects other than in the ordinary and normal course (other than as required by the transactions contemplated by this Agreement), (v) granted or committed to grant any salary increase to officers or employees in the Business, other than normal merit and cost of living increases and normal periodic increases pursuant to established compensation policies of Seller not in excess of $20,000 annually in the aggregate and not in excess of the lesser of $10,000 or seven percent in any individual case or paid or committed to pay any cash bonus to any employee, stockholder or Affiliate of Seller, (vi) in connection with the Business, created, incurred or assumed any debt for borrowed money other than trade payables incurred in the ordinary and normal course of business or refinanced any existing borrowings, (vii) paid any material obligation or liability (fixed or contingent) or settled any claim or suit pending or threatened against Seller, the Business or the Acquired Assets, other than in the ordinary and normal course of business, (viii) modified, amended, cancelled or terminated any existing Contracts other than in the ordinary and normal course of business and other than under circumstances that would not result in a material adverse effect on Seller, the Business or the Acquired Assets, (ix) modified, amended, settled, cancelled or terminated any Accounts Receivable, in whole or in part, or received any notice of any claim or setoff with regard to any Accounts Receivable, (x) lost the service of any key employee (including Walter B. Finley) whether by termination or otherwise and no such key employee has indicated an intention to terminate his or her employment or (xi) otherwise sustained or incurred any event or liability that has had or is reasonably likely to have a material adverse effect on Seller, the Business or the Acquired Assets.

(o)  <u>Taxes</u>.  Seller is an S corporation within the meaning of Section 1361(a)(1) of the Internal Revenue Code of 1986, as amended (the "Code") for which a valid election under Section 1362(a) of the Code has been made and remains

in effect. Seller has timely filed or caused to be filed, or shall timely file or cause to be filed, all Tax returns, Tax information returns and Tax reports required to be filed by it with any Governmental Authority on or prior to the Closing Date. Such returns, information returns and reports are or will be when filed true, correct and complete in all material respects. No extension of time within which to file any Tax return, Tax information return or Tax report which has not yet been filed has been requested or granted. Except to the extent reflected on the Closing Balance Sheet, all Taxes relating to the Business and required to be paid to any Governmental Authority on or prior to the Closing Date, and all claims, demands, assessments, judgments, costs and expenses connected therewith, have been paid in full by Seller or the Stockholders. Neither Seller nor any of the Stockholders has any knowledge of any Tax deficiency proposed or threatened against Seller or any of the Stockholders with respect to Taxes relating to the Business. All Taxes required by law to be withheld or collected by Seller on or prior to the Closing Date have been duly withheld and collected, and have been paid over to the proper Governmental Authority, or, if such payments are not yet due, have been accrued and reserved against on the Closing Balance Sheet. For purposes of this Agreement, the terms "Tax" and "Taxes" shall mean any and all taxes, charges, imposts, levies, duties, fees, withholdings, and other assessments, however denominated, imposed by any Governmental Authority, including, without limitation, income taxes, franchise taxes, net worth taxes, capital stock taxes, estimated taxes, withholding taxes, sales taxes, use taxes, value added taxes, gross or net receipts taxes, license taxes, environmental taxes, transfer taxes or fees, stamp taxes, registration duties, excise taxes, real and personal property taxes, ad valorem taxes, fuel taxes, excess or windfall profits taxes, occupancy taxes, occupational taxes, payroll and payroll related taxes, employment taxes, unemployment insurance, disability taxes, social security taxes, alternative or add-on minimum taxes, customs duties and other obligations of the same or a similar nature, together with any interest, penalties, fines, additions to tax, assessments, deficiencies or other amounts attributable to or imposed on or with respect to any such taxes, charges, imposts, levies, duties, fees, withholdings and other assessments.

(p) <u>Regulatory Approvals</u>. The Schedules entitled "Regulatory Approvals and Environmental Matters" attached hereto sets forth all consents, approvals, authority and other requirements prescribed by any law, rule or regulation that must be obtained or satisfied by Seller or any Stockholder and that are necessary for the consummation of the transactions contemplated by this Agreement.

(q) <u>Licenses, Permits and Governmental Approvals</u>. All Licenses have been duly obtained, are valid and in full force and effect, and there is no administrative or judicial proceeding to revoke, cancel or declare any such License invalid in any respect pending or, to the best knowledge of Seller and the Stockholders, threatened, except for such Licenses the failure of which to obtain, or the invalidity, revocation or cancellation of which, in the aggregate, would not result in a material adverse effect on Seller, the Business or the Acquired Assets. The Schedule entitled "Permits and Approvals" attached hereto contains a list of all Licenses and all pending applications therefor issued to Seller or any Stockholder that are currently used by Seller in the operation of the Business and issued to Seller or any Stockholder by any Governmental Authority, the absence of which would have a material adverse effect on Seller, the Business or the Acquired Assets. The Licenses are, and will be on the Closing Date, sufficient in all respects to permit the continued lawful conduct of the Business. The Business is not being conducted in a manner that violates any of the terms or conditions under which any License was granted, except for such violations which, individually or in the aggregate, have not resulted and will likely not result in a material adverse effect on Seller, the Business or the Acquired Assets. Seller has performed all obligations and satisfied all conditions required to be performed or satisfied by it to date under, and is not in default in respect of, any License and no event has occurred which, with due notice or lapse of time or both, would constitute such a default or permit the revocation or cancellation of any License, except for such breaches, defaults and prospective defaults that individually and in the aggregate have not resulted and will likely not result in a material adverse effect on Seller, the Business or the Acquired Assets. Seller has provided Buyer with a true, correct and complete copy of each License.

(r) <u>Products Liability</u>.

(i) Except as disclosed on the Schedule entitled "Litigation" attached hereto, (i) there has not been any notice, demand, claim, action, suit, inquiry, hearing, proceeding, notice of violation or investigation of a civil, criminal or administrative nature before any court or arbitration panel or governmental or other regulatory or administrative agency, commission or authority against or involving any product, substance or material (collectively, a "Product"), or class of claims or lawsuits involving the same or similar Product manufactured, distributed, sold or otherwise disposed of by or on behalf of Seller which is pending or, to the best knowledge of Seller and the Stockholders, threatened, resulting from an alleged defect in design, manufacture, materials or

workmanship of any Product manufactured, distributed, sold or otherwise disposed of by or on behalf of Seller, or any alleged failure to warn, or from any breach of implied warranties or representations, (ii) to the best knowledge of Seller and the Stockholders, there has not been any Occurrence (as defined below), and (iii) there has not been, nor is there under consideration or investigation by Seller, any Product recall, rework, retrofit or post-sale warning (collectively, "Recalls") conducted by or on behalf of Seller concerning any Product manufactured, distributed or sold by or on behalf of Seller or any Product Recall conducted by or on behalf of any entity as a result of any alleged defect in any Product supplied by Seller (all such claims, collectively, "Product Claims"), other than such claims, actions, suits, proceedings, investigations, Occurrences or Recalls that in the aggregate have not resulted and are not likely to result in a material adverse effect on Seller, the Business or the Acquired Assets.

(ii) For purposes of this Section 6.1(r), the term "Occurrence" shall mean any accident, happening or event that takes place at any time before the Closing Date which is caused or allegedly caused by any alleged hazard or alleged defect in manufacture, design, materials or workmanship including, without limitation, any breach of express or implied warranties or representations with respect to, or any such accident, happening or event otherwise involving, a Product (including any parts or components) manufactured, distributed, sold or otherwise disposed of by or on behalf of Seller that is likely to result in a claim or loss that would have a material adverse effect on Seller, the Business or the Acquired Assets.

(s) <u>Product Warranties and Warranty Claims</u>. The Schedule entitled "Product Warranties" attached hereto sets forth a complete and accurate summary of all product warranties given by Seller at any time during the past five years. Except as set forth on such Schedule, there are no product warranty claims pending, or to the best knowledge of Seller and the Stockholders, threatened, and to the best knowledge of Seller and the Stockholders, there is no state of facts or the occurrence of any event that would form the basis for any such product warranty or other tort claim. Seller has provided a true, correct and complete list of all warranty information provided to or relied upon by its Customers.

(t) <u>Insurance</u>. Seller has in full force and effect, with all premiums paid thereon, policies of insurance, or renewals thereof, on all of the Acquired Assets and for the Business of such types, in such amounts, and against all

liabilities, claims and risks against which it is customary and prudent to insure; which policies are all described on the Schedule entitled "Insurance" attached hereto. Seller shall cause such policies (or policies providing comparable coverage) to remain in full force and effect until the Closing Date.

(u) <u>Interested Persons</u>. No Stockholder, Affiliate of Seller or any Stockholder or any director, officer or employee of Seller (i) owns, directly or indirectly, any financial or legal interest in, or serves as an officer or director of, any material customer or supplier of the Business or any organization that has any material contract or arrangement with Seller or (ii) is a party to any material contract or arrangement with respect to the Business, except as disclosed in the Schedule entitled "Contracts" attached hereto under the heading "Interested Transactions."

(v) <u>Accounts Receivable</u>. All accounts receivable included in the Initial Balance Sheet are specifically identified on the Schedule entitled "Accounts Receivable" attached hereto, together with an indication of the value attributed to such Accounts Receivable in preparation of the Initial Balance Sheet. All such Accounts Receivable included in the Initial Balance Sheet arose from valid transactions actually made in the ordinary and normal course of business and there are no counterclaims or setoffs against any of the outstanding Accounts Receivable. The reserves set forth on the Initial Balance Sheet relating to the Accounts Receivable are believed to be adequate by Seller and are consistent with Seller's past practices. Seller and the Stockholders have no reason to believe that the Accounts Receivable listed on the Initial Balance Sheet will not be collectible except to the extent reserves for such Accounts Receivable have been set forth on the Initial Balance Sheet.

(w) <u>Inventories</u>. All of the items included in the Inventory on the Initial Balance Sheet are merchantable and saleable and do not include any damaged or obsolete items or items of below standard quality, except with respect to which adequate reserves are set forth or reflected on the Initial Balance Sheet. Any item included on the Initial Balance Sheet which was manufactured or produced to comply with particular specifications of a Customer, including any specifications established by a Government Authority, complies with such specifications and no such specifications have been altered or modified in a manner which could adversely affect the merchantability of such Inventory for the purposes for which it was produced. All of the Inventory listed on the Initial Balance Sheet was acquired by Seller with valid and enforceable rights of advertisement, promotion, distribution and sale, which

rights are transferable to and enforceable by Buyer. Neither the purchase nor the resale by Buyer of any of the Inventory, nor the use or distribution of any advertising or promotional materials, including catalogs, included in the Acquired Assets, shall violate, infringe or conflict with any statutory or common law copyright, trade name, trademark, service mark or other intellectual, proprietary, personal or other right of any person. The value at which the Inventory is carried on the Initial Balance Sheet reflects the cost on an average cost basis and reflects write-offs or write-downs for damaged or obsolete items, or items of below standard quality, in accordance with the historical inventory policy and practices of Seller with respect to the Business.

(x) <u>Third Party Consents</u>. Except as set forth in the Schedule entitled "Consents" attached hereto, no consent, approval or authorization of any person, partnership, corporation or other entity is required in connection with the execution or delivery of this Agreement by Seller or any Stockholder or the performance by Seller or any Stockholder of any obligations under this Agreement or is necessary to consummate the transactions contemplated hereunder or to prevent the termination of any right, privilege, license or agreement of Seller relating to the Business.

(y) <u>Employees</u>. The Schedule entitled "Employees" attached hereto is true, correct and complete and
(i) contains a complete list of all employees of Seller engaged in the Business as of the date hereof,
(ii) designates which employees are full or part time, their respective salaries, positions, years of service and locations to which such employees are assigned, their accrued vacation days, sick days and personal days and
(iii) identifies those employees who are on extended absence or who are receiving workers' compensation or other disability payments.

(z) <u>Employee Plans</u>. The Schedule entitled "Employee Benefits" attached hereto is a true, correct and complete summary of Seller's employee benefit plans. Except for the employee benefit plans disclosed on the Schedule entitled "Employee Benefits" attached hereto or described in the materials referred to thereon, copies of which Seller has heretofore provided to Buyer (collectively, the "Plans"), Seller does not maintain or contribute to any employee pension, benefit or welfare plans, as defined in the Employee Retirement Income Security Act of 1974 ("ERISA"), covering any employee of Seller employed in connection with the Business, nor has Seller or any of its officers or directors taken any action to institute any such employee pension, benefit or welfare plan. All contributions required to have been made to such Plans to meet the minimum funding requirements of ERISA have been made.

(aa) <u>Environmental Matters</u>. Except as set forth on the Schedule entitled "Regulatory Approvals and Environmental Matters" attached hereto, (i) the operations of the Business are in full compliance with all applicable federal and state environmental or health and safety laws, statutes, judgments, rulings and regulations, including, but not limited to, the Clean Air Act, the Clean Water Act, the Resource Conservation and Recovery Act, the Toxic Substance Control Act, each as amended, the state and local counterparts of each such act, and the federal, state and local regulations promulgated under each such act, and any other laws or regulations regulating human health and safety or the protection of the environment, whether adopted or in force before or after the Closing Date (collectively, the "Environmental Laws"), (ii) none of the operations of the Business is or has been subject within the past five years to any judicial or administrative proceeding under any Environmental Law, (iii) Seller has at all times applied for, obtained and presently has in effect all permits, licenses, registrations, approvals, consents and authorizations required by Environmental Laws in connection with the ownership and operation of the Business ("Environmental Permits"), Seller is in full compliance with the terms and conditions of the Environmental Permits which are fully transferable to Buyer and no such Environmental Permit expires within two years after the Closing Date, (iv) Seller, and any other person for whose conduct it is or may be held responsible, has not received any request for information, notice, demand letter, administrative inquiry, order or directive under any Environmental Law or relating to the release or discharge of any substance or material to the environment, (v) no Facility is listed on the National Priority List of the U.S. Environmental Protection Agency or any similar state list, or to the best knowledge of Seller and the Stockholders, is subject to any reporting, cleanup, remediation or corrective action requirements under any Environmental Law or ongoing federal or state investigation evaluating whether any action is needed to respond to a release of any hazardous or toxic waste or substance or constituent, asbestos, radon, petroleum products or any other chemical or substance currently regulated pursuant to any Environmental Law, (vi) Seller has not, with respect to the Business or the Facilities, filed or provided notice under any Environmental Law indicating past or present treatment, storage or disposal of hazardous waste (as defined in the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.) on or at the Facilities, and (vii) none of the Facilities contains or includes any asbestos, polychlorinated biphenyls, urea formaldehyde, underground tanks, sumps or subsurface structures.

(bb) <u>Absence of Certain Commercial Practices</u>. Neither Seller, nor any Stockholder, director, officer, agent or employee of Seller (or any person acting on behalf of any of

the foregoing) has given or agreed to give any gift or similar benefit of more than nominal value to any customer, supplier, Governmental Authority (including any governmental employee or official) or any other person who is or may be in a position to help, hinder or assist Seller, the Business or the person giving such gift or benefit in connection with any actual or proposed transaction relating to Seller or the Business, which gifts or similar benefits would individually or in the aggregate subject Seller or any Stockholder, director, officer, employee or agent of Seller to any fine, penalty, cost or expense or to any criminal sanctions. No such gift or benefit is required in connection with the operation of the Business to avoid any fine, penalty, cost, expense or material adverse change in condition (financial or otherwise), results of operations, properties, assets, liabilities, business or prospects of Seller or the Business.

(cc) <u>Disclosure</u>. No representation or warranty made by Seller or the Stockholders contained in this Agreement or in any other writing furnished pursuant hereto contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements and facts containing herein and therein, in light of the circumstances in which they were made, not false or misleading.

(dd) <u>Bulk Sales Affidavit</u>. The "Bulk Sales Affidavit" that Seller will deliver to Buyer within 20 days of the date hereof will be a true, correct and complete list as of the date hereof of (i) all of Seller's actual creditors, including each creditor's name, business address and the amount due to such creditor and (ii) all persons who are known to Seller to assert claims against Seller, even though such claims are disputed.

6.2 <u>Representations and Warranties of Buyer</u>. Buyer represents and warrants to Seller that:

(a) <u>Organization and Standing; Power and Authority</u>. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and has full corporate power and authority to own, lease or operate its assets and properties, to make and perform this Agreement and to perform the transactions contemplated hereby. This Agreement (and the transactions contemplated hereby) has been duly approved by Buyer and constitutes the valid, binding and enforceable obligation of Buyer.

(b) <u>Conflicts; Defaults</u>. Neither the execution and delivery of this Agreement by Buyer, nor the performance of its obligations hereunder, will (i) violate, conflict with, breach or constitute a default under any of the terms of any charter documents of Buyer or (ii) conflict with or violate any law, statute, judgment, decree, order, rule or