regulation of any Governmental Authority applicable to Buyer.

(c)   Brokers, Finders and Agents.   Buyer is not directly or indirectly obligated to anyone acting as a broker, finder or in any other similar capacity in connection with this Agreement or the transactions contemplated hereby.

## ARTICLE VII.   COVENANTS OF SELLER AND THE STOCKHOLDERS

7.1   Maintenance of Business. For the period from the date of this Agreement through the Closing Date, Seller shall diligently carry on the Business only in the ordinary course of business consistent with past practice and Seller and the Stockholders will use their best efforts to preserve the Business intact and the goodwill of the Business, to keep available to the Business the services of the Business' employees and to maintain the relationships between Seller and its suppliers, customers and others having business relations with them.  From the date of this Agreement through the Closing Date, Seller shall not, without the prior written consent of Buyer (i) make or commit to make capital expenditures of $25,000 or more in the aggregate, (ii) except for assets designated by Buyer for removal or disposal, dispose of any fixed asset included in the Acquired Assets or, except in the ordinary course of business, consistent with past practice, any asset that is not a fixed asset, (iii) subject any Acquired Assets to any Lien, (iv) incur, guarantee or otherwise become liable for any indebtedness for borrowed money, except trade payables incurred in the ordinary course of Seller's business, consistent with past practice, or refinance any existing borrowings, (v) enter into any new, or amend any existing, employee benefit plan, program or arrangement or grant any increase in salary or any bonus or amend any Contract in any material respect, (vi) enter into any purchase order for the sale of products that is not freely assignable to Buyer and that is for a term expiring after the Closing Date, (vii) enter into any license, trademark, technology transfer, joint venture, partnership or similar agreement, (viii) enter into any contract (except as described in subsections (vi) and (ix) hereof) that involves an expenditure of a dollar amount in excess of $10,000 (or equivalent in foreign currency) or that is for a term expiring after the Closing Date, (ix) enter into any purchase order for the sale of products that involves a dollar amount in excess of $30,000 (or equivalent in foreign currency), that is for a term expiring after the Closing Date, (x) enter into any transaction or otherwise conduct the Business in all material respects other than in the ordinary and normal course of business (other than as required by the transactions contemplated by this Agreement), (xi) pay any material obligation or liability (fixed or contingent) or settle any claim or suit pending or threatened against Seller, the Business or the Acquired Assets, other than in the ordinary and normal course of business and in

no event for an amount in excess of $10,000, (xii) modify, amend, cancel or terminate any existing contracts other than in the ordinary and normal course of business or other than under circumstances that would not result in a material adverse effect on Seller, the Business or the Acquired Assets, (xiii) modify, amend, settle, cancel or terminate any Accounts Receivable, in whole or in part or (xiv) enter into any contract, agreement or commitment with respect of any of the foregoing.

7.2    <u>Investigation by Buyer</u>. Seller shall allow Buyer, at Buyer's expense, during regular business hours, prior to the Closing Date, through Buyer's employees, agents or representatives, including, without limitation, its outside accountants and attorneys, to make such investigation of the business, properties, plants, books and records of the Business wherever located, and to make copies thereof, and to conduct such examination (including an examination of the audit work papers of any independent accountant) of the financial condition of the Business as Buyer deems necessary or advisable to familiarize itself with such business, properties, plants, books, records, financial condition and other matters and to verify the representations and warranties of Seller and the Stockholders hereunder. Any information provided or obtained pursuant to this Section 7.2 (including any information provided in the Schedules attached hereto) shall be treated by Buyer in accordance with the provisions of that certain Confidentiality Agreement dated March 21, 1995 between Buyer and Seller (the "Confidentiality Agreement").

7.3    <u>Consents and Best Efforts</u>. Seller and the Stockholders have commenced and will continue to use their respective best efforts to take, or cause to be taken by others, all action required to obtain all consents, approvals and agreements of any third parties or Governmental Authorities necessary to authorize, approve or permit the full and complete sale, conveyance, assignment or transfer of all of the Acquired Assets.

7.4    <u>Accounts Receivable; Receipts and Disbursements</u>. In the event that Seller receives any payments subsequent to the Closing Date relating to any Account Receivable outstanding on or after such date, such payment shall be the property of, and shall be forwarded and remitted within one business day after receipt to, Buyer without regard to any counterclaims or setoffs.

7.5    <u>Closing Conditions</u>. Seller and the Stockholders shall use their respective best efforts to cause the conditions set forth in Section 5.1 to be satisfied by the Closing Date.

7.6    <u>Exclusive Negotiations</u>. For the period from the date hereof through the Closing Date, Seller, Stockholders and each of their respective Affiliates shall not (i) solicit or accept from any other person or entity any offer with respect to an acquisition, combination or similar transaction involving

Seller, the Business or the Acquired Assets or (ii) provide any confidential or proprietary information relating to or concerning Seller, the Business, the Acquired Assets, any of the financial statements relating to Seller, the Business or the Acquired Assets or any other information supplied by Seller or its agents to Buyer pursuant to, or in connection with, this Agreement or the transactions contemplated hereby to any other person or entity; provided, however, that if Buyer has not delivered to Seller on or prior to May 25, 1995 a copy of the consent satisfying the closing condition set forth in Section 5.1(h), this Section 7.6 shall not apply from May 26, 1995 until such time as Buyer delivers such consent to Seller.

7.7    Non-Competition.

(a)    Period and Conduct.  As further consideration for the purchase and sale of the Acquired Assets and the transactions contemplated by this Agreement, for a period of five years after the Closing Date, Seller and its Affiliates (except that, solely for such purposes of this Section 7.7, this definition shall not include Walter B. Finley; provided, however, that nothing herein shall be construed to limit the obligations of Walter B. Finley arising by operation of the law or general equitable principles) shall not, without the prior written consent of Buyer, (i) Compete (as defined below) within the Territory (as defined below), directly or indirectly, with Buyer, (ii) solicit or encourage any employee of Buyer to leave the employ of Buyer or (iii) hire any employee who has left the employment of Buyer if such hiring is proposed to occur within one year after the termination of such employee's employment with Buyer.

(b)    Definition of Territory.  For purposes hereof, the term "Territory" shall mean the United States of America.

(c)    Definition of Compete.  For purposes hereof, the term "Compete" shall mean (i) engaging in as a stockholder, partner, joint-venturer, agent or in any other capacity or (ii) rendering services, information or advice to any other person pertaining to any business involving or relating to designing, manufacturing and selling thermoplastic materials and application equipment for highway pavement marking.

(d)    Suppliers; Customers.  For a period of five years after the Closing Date, Seller shall not induce or attempt to induce, and shall cause its Affiliates not to induce or attempt to induce, individually or in association with others, directly or indirectly, any supplier or customer of Buyer, or any former customer of Seller in connection with the Business, to cease doing business in whole or in part with Buyer or solicit the business of any such customer for any business involving or relating to the designing,

manufacturing and selling of thermoplastic materials and application equipment for highway pavement marking or services associated therewith.

(e)  <u>Remedies</u>.  Inasmuch as any breach of, or failure to comply with, this Section 7.7 will cause serious and substantial damage to Buyer, if Seller should in any way breach, or fail to comply with, the terms of this Section 7.7, Buyer shall be entitled to an injunction restraining Seller from such breach or failure.  All remedies expressly provided for herein are cumulative of any and all other remedies now existing at law or in equity.  Buyer shall, in addition to the remedies herein provided, be entitled to avail itself of all such other remedies as may now or hereafter exist at law or in equity for compensation and for the specific enforcement of the covenants contained in this Section 7.7.  Resort to any remedy provided for in this Section 7.7 or provided for by law shall not prevent the concurrent or subsequent employment of any other appropriate remedy or remedies or preclude the recovery by Buyer of monetary damages and compensation.

(f)  <u>Severability</u>.  Each subsection of this Section 7.7 constitutes a separate and distinct provision hereof. In the event that any provision of this Section 7.7 shall finally be determined to be invalid, ineffective or unenforceable, every other provision of this Section 7.7 shall remain in full force and effect.  The invalid, ineffective or unenforceable provision shall, without further action by the parties, be automatically amended to effect the original purpose and intent of the invalid, ineffective or unenforceable provision.

7.8  <u>Disclosure Supplements</u>.  From time to time prior to the Closing, Seller shall supplement or amend the Schedules to this Agreement with respect to any matter (i) that may arise hereafter and that, if existing or occurring at or prior to the date hereof, would have been required to be set forth or described in the Schedules to this Agreement or (ii) that makes it necessary to correct any information in the Schedules to this Agreement or in any representation and warranty of Seller or the Stockholders which has been rendered inaccurate.  Such supplements and amendments shall be subject to Buyer's written approval.  No supplement or amendment of any Schedule made pursuant to this Section 7.8 shall be deemed to cure any breach of any representation or warranty made in this Agreement unless Buyer specifically waives such breach in writing.

7.9  <u>Delivery of Original Registrations</u>.  On or before the Closing Date, upon request by Buyer, Seller shall deliver, or shall cause to be delivered, to Buyer's counsel, all original certificates of registration and original patents relating to the Intellectual Property and all original pending patent and trademark applications.

7.10   Transfer of Licenses.   Seller and the Stockholders shall cooperate with Buyer to effect the transfer, issuance or the re-issuance to Buyer of all Licenses to the extent necessary for the continued operation of the Business as of the Closing.   The transfer, issuance or reissuance of such Licenses shall occur as of the Closing or as promptly thereafter as is reasonably possible.   Following the Closing, Seller and the Stockholders shall cooperate with any efforts of Buyer to complete the actions required to transfer or obtain the issuance or reissuance of all such Licenses.   During any interim period from the Closing until completion of the transfer, issuance or reissuance of any such License in Buyer's name, Seller agrees to provide Buyer with the benefits of such License to the extent allowed by applicable law.

7.11   Environmental Inspection, Audit and Testing.

(a)   Buyer shall have the right to cause independent environmental consultants chosen by Buyer at its sole discretion, to inspect, audit and test the Facilities for the existence of any and all environmental conditions and any and all violations of Environmental Laws (the "Environmental Audits") and to deliver a report describing the findings and conclusions of the Environmental Audits. The scope, sequence and timing of the Environmental Audits shall be at the sole discretion of Buyer; provided that any such Environmental Audit shall not be conducted in a manner unnecessarily disruptive to the Business.   The cost and expense of the Environmental Audits shall be borne by Buyer.

(b)   If any Environmental Audit reveals or, at any time prior to the Closing Date, Buyer otherwise becomes aware of, the existence of any environmental condition or violation of an Environmental Law that Buyer is unwilling to accept, Buyer shall have the right and option, in its sole and absolute discretion, to:

(i)   allow Seller additional time prior to the Closing Date in which to undertake actions sufficient to remedy any such environmental condition or violation of an Environmental Law, in which case the Closing shall be appropriately postponed;

(ii)   attempt to negotiate a reduction in the Purchase Price to compensate Buyer for costs and damages that may be associated with any such environmental condition or violation of an Environmental Law; or

(iii)   terminate this Agreement and declare it null and void.

(c)   In the event that Buyer seeks to exercise its rights under subsection (b)(i) or (b)(ii) hereof and the

parties are unable to agree on the appropriate remedy or reduction in the Purchase Price, as the case may be, prior to June 15, 1995, Seller and the Stockholders may terminate this Agreement; provided that Seller first delivers to Buyer cash in an amount equal to the costs and expenses of the Environmental Audits incurred by Buyer unless such amount exceeds $15,000, in which event, Seller shall deliver cash in an amount equal to $15,000. In the event of a termination of this Agreement by Seller and the Stockholders hereunder, absent fraud, Buyer hereby waives any claims which Buyer may otherwise possess under this Agreement for any claims for breach of the representations and warranties as set forth in Section 6.1(aa) hereof to the extent arising from the information revealed pursuant to the Environmental Audits.

7.12   <u>Dividends</u>.  Seller shall not, after the date of this Agreement and prior to Closing, pay any dividend or make any other distribution with respect to shares of capital stock or otherwise to its Stockholders.

7.13   <u>Fire Department Permit</u>.  Seller shall use its best efforts to obtain renewal of the License listed on the Schedule entitled "Permits and Approvals" attached hereto and identified as the "Atlanta Fire Department Permit (4/94-4/95)."

7.14   <u>Bulk Sales Affidavit</u>.  Seller shall deliver the Bulk Sales Affidavit to Buyer within 20 days of the date hereof.

7.15   <u>Notes to Interim Financial Statements</u>.  On or prior to May 25, 1995, Seller shall deliver to Buyer the Notes to the Interim Financial Statements which shall be subject to reasonable prior review and approval of Buyer and which shall conform in all respects with Section 6.1(f) hereof.

7.16   <u>Year-End Financial Statements</u>.  On or prior to May 18, 1995, Seller shall deliver to Buyer the Draft Year-End Financial Statements in final form (the "Year-End Financial Statements").

<u>ARTICLE VIII.   COVENANTS OF BUYER</u>

8.1   <u>Maintenance of, and Access to, Records</u>.  Buyer shall, whenever reasonably requested by Seller or to the extent required by Seller for the performance of Seller's obligations under this Agreement, including, without limitation, its obligations under Section 3.2, permit Seller to have access to all corporate and business records turned over to Buyer pursuant to Section 1.1(g).  Buyer shall preserve and maintain such books and records for at least five years after the Closing Date.

8.2   <u>Closing Conditions</u>.  Buyer shall use its best efforts to cause the conditions set forth in Section 5.2 to be satisfied by the Closing Date.

## ARTICLE IX.  CERTAIN ADDITIONAL COVENANTS

9.1   <u>Expenses</u>.  Except as otherwise specifically provided herein, each party hereto will bear the legal, accounting and other expenses incurred by such party in connection with this Agreement and the other agreements and transactions contemplated hereby.

9.2   <u>Further Assurance</u>.  From time to time after the Closing, upon request of Buyer, Seller and the Stockholders shall execute, acknowledge and deliver all such other instruments of sale, assignment, conveyance and transfer and shall take all such other action as may be reasonably required to transfer to and vest title in Buyer in, and to put Buyer in possession of, any of the Acquired Assets.

9.3   <u>Government Notification</u>.  As soon as practicable after the execution of this Agreement, if required, Buyer and Seller shall file, or cause to be filed, with such Governmental Authorities such notification and documentary material as may be required in connection with the direct or indirect acquisition of the Acquired Assets by Buyer pursuant to this Agreement. Thereafter Buyer and Seller, as necessary, will promptly file, or cause to be filed, any additional information requested by such Governmental Authorities as soon as practicable after receipt of the request for additional information.

9.4   <u>Press Releases</u>.  Unless required to be made pursuant to any applicable law, regulation or other requirement of any Governmental Authority or stock exchange (a "Required Announcement"), neither Seller nor Buyer shall make any public announcement or issue any press release regarding this Agreement or the consummation of the transactions contemplated hereby without the prior consent of the other party hereto to such announcement or press release.  Notwithstanding the foregoing, any party intending to make a Required Announcement shall give notice to the other party of such Required Announcement and shall provide such other party with the text of such Required Announcement and a reasonable opportunity to comment thereon prior to making the Required Announcement.

9.5   <u>Trade Names</u>.  Seller shall, and shall cause its Affiliates to, as soon as reasonably practicable following the Closing Date, cease to use any trade names, trademarks, services marks, logos, designs or similar rights and interests included in the Acquired Assets, including the name "PAVE-MARK CORPORATION" or any abbreviation or variation thereof ("Acquired Names") in the operation of their business, including on any plant, building or equipment or any stationery, business form, packaging,

container, sign or other property (real or personal) included in the Retained Assets; provided, however, that Seller shall, within 14 days following the Closing, prepare, execute and file appropriate documents with the Secretary of State of the State of Florida and all appropriate authorities where Seller is qualified to do business to change the corporate names of Seller so that they do not include any Acquired Name or any name confusingly similar thereto.

9.6    <u>Notifications</u>.  Each party hereto shall promptly notify the other party in writing upon receiving notice of any event that will or is likely to result in the failure of such party to satisfy any of the conditions contained in Article V hereof.

9.7    <u>Employee-Related Matters</u>.

(a)    <u>Offer of Employment to Seller's Employees</u>.  After the Closing, Buyer may offer employment to certain or all of Seller's employees.  Any employment provided for in the preceding sentence shall, unless Buyer shall otherwise determine, be at will and shall not be deemed to be pursuant to any contract of employment, express or implied, and nothing shall limit Buyer's right to terminate any such employee's employment with or without cause and with or without notice.  Seller shall use its best efforts to encourage its employees to accept any such offers of employment.

(b)    <u>Limitation of Benefits and Liabilities</u>.  Nothing herein is intended to confer upon any employee of Seller any rights of any kind whatsoever under or by reason of this Agreement, including, without limitation, any rights to or of employment for a specified period or any other form of employment security.  Buyer shall not assume any obligation or liability for any employment practices or policies maintained by Seller with respect to Seller's employees. Buyer shall have no obligation or liability nor incur any cost or expense with respect to any claims, including, without limitation, for health or medical insurance benefits, whether arising before or after the Closing, by any employee or former employee of Seller arising by reason of the sale or purchase of the Acquired Assets pursuant to this Agreement or by reason of such employee or former employee's employment, or the termination of his or her employment, by Seller.  Without limiting the foregoing, any severance obligation arising by reason of Seller's termination of any employee's employment in connection with the sale of the Acquired Assets by Seller pursuant to this Agreement shall remain the sole liability of Seller and Seller shall comply in all respects with the applicable continuation coverage requirements of Section 4980B of the Internal Revenue Code and Part 6 of Title I of ERISA in connection with the transactions contemplated by this

Agreement. Seller shall and hereby does retain, and Buyer shall not assume or be responsible for, each Plan and all liabilities and obligations in connection therewith and any other liability or obligation in connection with any other plan, agreement or arrangement maintained or contributed to by Seller or any Affiliate of Seller for the benefit of their respective employees, and Seller shall satisfy or pay all such liabilities and obligations.

9.8   Cooperation.

(a)   Litigation, Proceedings, Investigations, Etc. Each of the parties hereto shall cooperate with the other party in its defense or resolution of any litigation, proceeding, investigation or claim made against it relating to or arising from its ownership of the Acquired Assets or Acquired Liabilities or Retained Assets or Retained Liabilities or operation of the Business; provided, however, that the provisions of this Section 9.8(a) shall not apply with regard to claims, litigation or other proceedings made or commenced against Buyer or any of its Affiliates by Seller, any Stockholder or any of their respective Affiliates or against Seller, any Stockholder or any of their respective Affiliates by Buyer or any of its Affiliates.

(b)   Nature of Cooperation. The cooperation contemplated by this Section 9.8 shall include, but shall not be limited to, each party's providing the other party with reasonable access to documents and other records in the party's possession that relate to the Acquired Assets or the Business and making the party's personnel available upon reasonable terms, at reasonable times and for reasonable periods to consult with and provide information relating to the Acquired Assets or Business to the other party. The party requesting the other party's cooperation pursuant to this Section 9.8 shall reimburse the party providing cooperation for costs incurred by it in providing such cooperation.

9.9   Accounts Receivable Collection. If Seller or any Stockholder receives any payment subsequent to the Closing Date in connection with any Account Receivable, such payment shall be the property of Buyer, and, at Seller's expense, shall be endorsed, if necessary, without recourse and forwarded by Seller or such Stockholder, by first class mail postage prepaid, within one business day after receipt thereof, to Buyer. If Buyer receives any payment subsequent to the Closing Date relating to any account receivable listed on the Schedule entitled "Retained Contracts" attached hereto, such payment shall be the property of Seller, and, at Buyer's expense, shall be endorsed, if necessary, without recourse and forwarded by Buyer, by first class mail postage prepaid, within one business day after receipt thereof, to Seller. Payments remitted by or on behalf of customers to

either Buyer or Seller relating to any account receivable from any of the entities listed on the Schedule entitled "Retained Contracts" attached hereto shall be first credited to the account receivable bearing the earliest date unless the customer has specified the particular invoice to which a remittance pertains, in which case credit shall be made to the invoice specified.

9.10  Accounts Receivable of Restricted Customers.  If and to the extent that Buyer has not collected, on or before the date that is six months from the Closing Date, any of the Accounts Receivable that arise from or relate to sales made after the date hereof and until the Closing Date to any of the entities, or Affiliates of any of the entities, set forth on the Schedule entitled "Retained Contracts" attached hereto and noted thereon as a "Restricted Customer" (such uncollected Accounts Receivable, the "Post-Execution Accounts Receivable"), the Purchase Price shall be reduced by, and the Escrow Agent shall pay to Buyer from the Escrow Amount, cash in an amount equal to the Post-Execution Accounts Receivable, and if the Escrow Amount is insufficient, Seller shall pay to Buyer cash in an amount equal to such insufficiency, and, thereafter, the Post-Execution Accounts Receivable shall become the property of Seller and if Buyer receives any payment relating to the Post-Execution Accounts Receivable, such payment shall be the property of Seller, and, at Buyer's expense, shall be endorsed, if necessary, without recourse and forwarded by Buyer, by first class mail postage prepaid, within one business day after receipt thereof, to Seller.  To the extent payments are required to be made pursuant to this Section 9.10 out of the Escrow Amount, Buyer and Seller shall deliver joint instructions to the Escrow Agent with respect thereto on or before the date that is six months from the Closing Date.

ARTICLE X.  INDEMNIFICATION

10.1  Indemnification by Buyer.

(a)    General.  From and after the Closing Date, Buyer shall indemnify, defend and hold Seller harmless from and against any and all claims, losses, liabilities, damages, costs and expenses (including, without limitation, attorneys' fees to the extent permitted by law) (collectively, "Liabilities") that are actually incurred by Seller arising from: (i) the Assumed Liabilities, (ii) the failure of Buyer to report the purchase of the Acquired Assets in accordance with the allocations required by Section 3.3, (iii) any breach of any representation or warranty of Buyer which by the terms of this Agreement shall survive the Closing, or any covenant, obligation or agreement of Buyer contained herein and (iv) the operation of the Business or the Acquired Assets during the period after the Closing Date (other than with respect to Retained Liabilities).

(b)    <u>Maximum Amount of Indemnification Liability</u>. Notwithstanding any provision in this Agreement to the contrary, the maximum amount of indemnification that may be required of Buyer in the aggregate under Section 10.1(a)(i), (ii) and (iii) shall not exceed the amount of the Purchase Price.  .

10.2    <u>Indemnification by Seller and the Stockholders</u>.

(a) .  <u>General</u>. .From and after the Closing Date, Seller and the Stockholders, jointly and severally, shall indemnify, defend and hold Buyer harmless from and against any and all Liabilities that are actually incurred by Buyer arising from: (i) the Retained Liabilities, (ii) the failure of Seller and the Stockholders to report the sale of the Acquired Assets in accordance with the allocations required by Section 3.3, (iii) any breach of any representation or warranty of Seller or any Stockholder which by the terms of this Agreement shall survive the Closing, or any covenant, obligation or agreement of Seller or any Stockholder contained herein and (iv) any failure to comply with the laws of any jurisdiction relating to bulk transfers that may apply in connection with the transfer of the Acquired Assets to Buyer.

(b)    <u>Maximum Amount of Indemnification Liability for Certain Stockholder</u>.  Notwithstanding any provision of this Agreement to the contrary, the maximum amount of indemnification that may be required of Walter B. Finley in the aggregate under Section 10.2(a) shall not exceed the amount of the Purchase Price received by Walter B. Finley and shall be limited to five percent of any amounts awarded under Section 10.2(a); provided, however, that nothing herein shall limit Buyer's right to obtain indemnification from Seller or any other Stockholder.

10.3    <u>Notice of Claims</u>.  Notwithstanding any other provision contained in this Agreement, any party entitled to indemnification hereunder (the "Indemnified Party") shall give to the party from whom indemnification is sought (the "Indemnifying Party") <u>prompt</u> written notice of the claim and, when known, the facts constituting the basis for such claim; provided that, the failure to give any such notice shall not affect the Indemnified Party's rights to indemnification hereunder.  In the event of any claim for indemnification made hereunder resulting from or in connection with any claim or legal proceeding by a person who is not a party to this Agreement, the notice to the Indemnifying Party shall specify, if known, the amount or an estimate of the amount of the liability arising therefrom.

10.4    <u>Defense by Indemnifying Party</u>.  In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any claim or legal proceeding by a person who is not a party to this Agreement, the Indemnifying Party at its

sole cost and expense may (but shall not be required to), upon written notice to the Indemnified Party, assume the defense of any such claim or legal proceeding if it acknowledges to the Indemnified Party in writing its obligation to indemnify the Indemnified Party with respect to such claim. The Indemnified Party shall be entitled to participate in (but not control) the defense of any such action, with its counsel and at its own expense. If the Indemnifying Party does not assume the defense of any such claim or litigation resulting therefrom, (a) the Indemnified Party may defend against such claim or litigation, in such manner as it may deem appropriate, including, but not limited to, settling such claim or litigation (after giving notice of the same to the Indemnifying Party) on such terms as the Indemnified Party may deem appropriate, and (b) the Indemnifying Party shall be entitled to participate in (but not control) the defense of such action, with its counsel and at its own expense.

10.5 _Manner of Indemnification_. All indemnification hereunder shall be effected by payment of cash or delivery of a certified or official bank check in the amount of the indemnified Liability.

10.6 _Insurance_. The amount of any Liability for which an Indemnified Party shall be entitled to indemnification under this Article X shall be net of the amount of insurance proceeds, if any, related to such Liability received by or on behalf of the Indemnified Party or any Affiliate thereof.

10.7 _Mitigation_. Seller and Buyer each agree to use all reasonable efforts to mitigate any loss or damage for which they may seek indemnity under this Article X.

### ARTICLE XI.  MISCELLANEOUS

11.1 _Survival of Representations and Warranties_. The representations and warranties of the parties hereto made in the Agreement shall not be affected by any information furnished to, or any investigation conducted by, any of them or their representatives in connection with the subject matter of this Agreement and such representations and warranties shall survive for a period of two years from the Closing Date.

11.2 _Amendments_. This Agreement may be amended only by a writing executed by all of the parties hereto.

11.3 _Termination; Abandonment_.

(a) _By Buyer_. If any condition precedent to Buyer's obligation to effect the Closing, as set forth in Section 5.1, is not satisfied and such condition is not waived, if waivable, by Buyer on or prior to the Closing Date, as it may be extended by mutual agreement of the parties hereto,

Buyer shall not be obligated to effect the Closing and may terminate this Agreement by notice to Seller.

(b)    By Seller.  If any condition precedent to Seller's obligation to effect the Closing, as set forth in Section 5.2, is not satisfied and such condition is not waived, if waivable, by Seller on or prior to the Closing Date, as it may be extended by mutual agreement of the parties hereto, Seller shall not be obligated to effect the Closing and may terminate this Agreement by notice to Buyer.

(c)    Effect of Termination.  In the event of the termination of this Agreement pursuant to subsection (a) or (b) of this Section 11.3, this Agreement shall thereafter become void and have no effect, without any liability on the part of any party hereto or their respective directors, officers, stockholders, employees or agents in respect thereof; except as follows:  (i) nothing herein shall relieve any party from liability for any breach of this Agreement prior to termination under subsection (a) or (b) of this Section 11.3 and (ii) the obligations of the parties hereto set forth in Section 9.1 shall not be affected by a termination or abandonment of this Agreement.

11.4    Entire Agreement.  This Agreement and the other agreements expressly provided for herein set forth the entire understanding of the parties hereto and supersede all prior contracts, agreements, arrangements, communications, discussions, representations and warranties, whether oral or written, between the parties.

11.5    Governing Law.  This Agreement shall in all respects be governed by and construed in accordance with the laws of the State of Illinois.

11.6    Notices.  Any notice, request or other communication required or permitted hereunder shall be in writing (including telecopy or similar writing) and shall be given to the parties at their respective addresses set forth below:

To Seller and
the Stockholders:

Martin A. Smith
5300 Long Island Drive
Atlanta, Georgia  30327
Telecopy No.:  (404) 255-1876

With a copy to:

Rogers & Hardin
2700 Cain Tower, Peachtree Center
229 Peachtree Street, N.E.
Atlanta, Georgia 30303
Attention:  Michael Rosenzweig, Esq.
Telecopy No.:  (404) 525-2224

To Buyer:                    Stimsonite Corporation
                             7542 Natchez Avenue
                             Niles, Illinois  60714
                             Attention:  President
                             Telecopy No.: (708) 647-2310

With a copy to:              Jones, Day, Reavis & Pogue
                             77 West Wacker
                             Chicago, Illinois 60601-1692
                             Attention:  Timothy J. Melton, Esq.
                             Telecopy No.: (312) 782-8585

or such other address or telecopy number as such party may
hereafter specify by notice in writing to the other party.  Each
such notice, request or other communication shall be effective
(i) if given by telecopy, when such telecopy is transmitted to
the telecopy number specified above and the appropriate
confirmation is received, and a written confirmation is sent by
U.S. Mail, postage prepaid, or (ii) if given by any other written
means, when delivered at the addresses specified in this Section
11.6.

11.7  Counterparts.  This Agreement may be executed in
any number of counterparts, each of which shall be deemed to be
an original, and all of which together shall constitute one and
the same instrument.

11.8  Assignment.  This Agreement shall be binding upon
and inure to the benefit of the parties and their respective
successors and assigns, but no rights, obligations or liabilities
hereunder shall be assignable by either party without the prior
written consent of the other party except that Buyer may assign
all or any part of its rights hereunder to any Affiliate of Buyer
or to any subsequent purchaser of all or any portion of the
Business.

11.9  Waivers.  Any waiver by any party of any
violation of, breach of or default under any provision of this
Agreement or any other agreements provided for herein by the
other party shall not be construed as, or constitute, a
continuing waiver of such provision or waiver of any other
violation of, breach of or default under any other provision of
this Agreement or any other agreements provided for herein.

11.10 Third Parties.  Nothing expressed or implied in
this Agreement is intended, or shall be construed, to confer upon
or give any person or entity other than Buyer and Seller any
rights or remedies under or by reason of this Agreement.

11.11 Exhibits and Schedules.  The Exhibits and
Schedules attached to this Agreement are incorporated herein and
shall be part of this Agreement for all purposes.

CHMAIN02 Doc:.106227_1                46

11.12 <u>Headings</u>.  The headings in this Agreement are solely for convenience of reference and shall not be given any effect in the construction or interpretation of this Agreement.

11.13 <u>Definition of Affiliate</u>.  For the purposes of this Agreement, the term "Affiliate" shall mean any person, firm or corporation that directly, or indirectly through one or more entities, controls or is controlled by, or is under common control with, the person specified.

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Agreement as of the date first above written.

PAVE-MARK CORPORATION

By /s/ Martin A. Smith
    Its:  President

THE STOCKHOLDERS

/s/ Martin A. Smith
Name:  Martin A. Smith

/s/ Judith Smith
Name:  Judith Smith

/s/ Walter B. Finley
Name:  Walter B. Finley

STIMSONITE CORPORATION

By /s/ Jay R. Taylor
    Its:  President

CHMAIN02 Doc: 106227_1

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Escrow Agreement") dated as of _____, 1995, is made by and among PAVE-MARK CORPORATION, a Florida corporation ("Seller"), and MARTIN A. SMITH, JUDITH SMITH and WALTER B. FINLEY, (collectively, the "Stockholders"), STIMSONITE CORPORATION, a Delaware corporation ("Buyer"), and LASALLE NATIONAL TRUST, N.A., a national banking association ("Escrow Agent").

## W I T N E S S E T H

WHEREAS, Seller, Stockholders and Buyer have entered into an Asset Purchase Agreement, dated as of April 28, 1995 (the "Purchase Agreement"), for the sale and purchase of the properties and assets specified therein; and

WHEREAS, pursuant to Section 3.3 of the Purchase Agreement, Buyer is required to deliver to Escrow Agent, contemporaneously with the Closing of the Purchase Agreement, Five Hundred Thousand Dollars ($500,000), representing a portion of the Purchase Price, which sum is to be held in escrow by Escrow Agent to provide a source of funds for certain potential obligations of Seller and the Stockholders arising under or related to the Purchase Agreement;

NOW THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained and other good and valuable consideration had and received, Buyer, Seller, the Stockholders and Escrow Agent hereby agree as follows:

1.    **Definitions.**  Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Purchase Agreement.

2.    **Deposit of Escrow Funds.**  Upon the execution of this Escrow Agreement, Buyer is delivering Five Hundred Thousand Dollars ($500,000) (the "Escrow Amount") in immediately available same day funds to Escrow Agent, the receipt of which is hereby acknowledged by Escrow Agent.  Escrow Agent shall hold the Escrow Amount, together with all interest accumulated thereon and proceeds or losses therefrom, in escrow (the "Escrow Fund") upon the terms and conditions set forth in this Escrow Agreement.

3.    **Investments.**

(a)  Escrow Agent agrees to invest and reinvest the funds in the Escrow Fund at the direction and risk of Seller and the Stockholders during the term of the escrow. Upon written instructions signed by an officer of Seller and

by each of the Stockholders, Escrow Agent shall invest and reinvest the Escrow Fund in one or more of the following investments (the "Obligations") from time to time:

    (i)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America, or

    (ii)    repurchase agreements with Escrow Agent involving securities of the kind listed in subsection (i) above, or

    (iii)    money market funds authorized to invest in direct obligations of, or obligations fully guaranteed as to principal and interest by, the U.S. Government and repurchase agreements with respect to such securities.

If Seller and the Stockholders shall at any time for any reason fail to instruct Escrow Agent as to the investment of the Escrow Fund, Escrow Agent shall, until it receives instructions to the contrary from Seller and the Stockholders, invest the Escrow Fund in Obligations of the type specified in subsection (i) above. Investment and reinvestment of the Escrow Fund shall be made only in Obligations.

    (b)    Until the Escrow Agent makes the payments required under Section 3.2(c) of the Purchase Agreement out of the Escrow Fund (the "Initial Escrow Payment"), at least $250,000 of the Escrow Fund shall be invested and reinvested in Obligations having a maturity of no more than 30 days from the date of purchase. With respect to amounts in excess of $250,000 in the Escrow Fund before the Initial Escrow Payment is made and with respect to any amounts remaining in the Escrow Fund after the Initial Escrow Payment is made, all such amounts in the Escrow Fund shall be invested and reinvested in Obligations having a maturity of no more than the shorter of (i) 90 days from the date of purchase or (ii) such period of time as remains between the date upon which the investment in the Obligation is made and the first anniversary of the date hereof. Any amounts remaining in the Escrow Fund after the first anniversary of the date hereof shall be invested and reinvested in Obligations having a maturity of no more than 90 days from the date of purchase.

    (c)    Interest and other earnings on the Obligations shall be added to the Escrow Fund. Any loss incurred from an investment will be borne by the Escrow Fund.

4.  <u>Release of Escrow Funds</u>.  Escrow Agent shall hold the Escrow Fund in its possession until authorized hereunder to deliver the Escrow Fund or any specified portion thereof, as follows:

(a)  Subject to the provisions of Section 4(c) hereof, on the Final Payment Date, Escrow Agent shall make the Initial Escrow Payment to Buyer and/or Seller in accordance with joint instructions delivered by Buyer and Seller pursuant to Section 3.2(c) of the Purchase Agreement.

(b)  Subject to the provisions of Section 4(c) hereof, Escrow Agent shall distribute the amount remaining in the Escrow Fund to Seller on the first anniversary of the date hereof.

(c)  Notwithstanding the provisions of Section 4(a) and 4(b) hereof, if within one year of the date hereof, Escrow Agent receives notice from Buyer that, pursuant to Section 10.2 of the Purchase Agreement, Buyer has suffered any Liabilities for which Buyer believes it is entitled to be indemnified by Seller or any Stockholder under said Section 10.2 of the Purchase Agreement (which notice shall include Buyer's estimate of the amount of such Liabilities and shall state whether or not such Liabilities arise from the assertion of liability by a third party) Escrow Agent shall continue to hold a portion of the Escrow Fund equal to Buyer's estimate of such Liabilities (or, if Buyer's estimate exceeds the Escrow Fund, the entire Escrow Fund) in escrow until there has been a Final Determination (as defined in Section 6 hereof) of the amount of such Liabilities.  Upon notice to Escrow Agent of such Final Determination and upon delivery by Buyer to Escrow Agent of evidence (in the form described in Section 6 hereof) of the amount of the Liabilities as provided in the Final Determination, Escrow Agent shall, subject to the 30-day notice provisions set forth in the last sentence of this Subsection (c), promptly distribute to Buyer the amount held in escrow equal to the amount of such Liabilities as provided in the Final Determination.  Upon any notice or delivery of evidence to Escrow Agent by Buyer as set forth in this Subsection (c), Escrow Agent shall promptly notify Seller and the Stockholders (and furnish it with copies) of the same.  If Seller and the Stockholders, within 30 days after notice to Escrow Agent from Buyer that there has been a Final Determination of any Liabilities not resulting from liability asserted by a third party, notifies Escrow Agent that Seller and the Stockholders dispute such Final Determination, Escrow Agent shall not distribute the amount of such Liabilities, or any portion thereof, to Buyer until such dispute has been settled as provided in Section 5 hereof and notice of such settlement and of the amount, if any, to be paid in respect of the disputed Liabilities has been given to Escrow Agent.

5.  <u>Settlement of Disputes</u>.  If Seller and the
Stockholders notify Escrow Agent as provided in Section 4(c)
hereof that Seller and the Stockholders dispute the Final
Determination of Liabilities not resulting from the assertion of
liability by a third party, such dispute, and any other dispute
that may arise under the Escrow Agreement with respect to the
delivery of ownership or right of possession of the Escrow Fund
or the duties of Escrow Agent hereunder, shall be settled either
by mutual agreement of the parties concerned (evidenced by
appropriate instructions in writing to Escrow Agent signed by all
such parties) or by a binding arbitration, or by a final order,
decree or judgment of a court of competent jurisdiction in the
United States of America (the time for appeal having expired and
no appeal having been taken), all costs and expenses of which
shall be paid by such parties.  Escrow Agent shall be under no
duty whatsoever to institute or defend any such proceedings.
Prior to the settlement of any such dispute, Escrow Agent is
authorized and directed to retain in its possession, without
liability to anyone, that portion of the Escrow Fund that is the
subject of such dispute.

6.  <u>Final Determination</u>.  For the purpose of this
Escrow Agreement, a "Final Determination" shall mean:

(a)  in the case of any Liabilities resulting from
the assertion of liability by a third party, a written
compromise or settlement signed by the parties thereto, a
binding arbitration award, or a final order, decree or
judgment of a court of competent jurisdiction in the United
States of America (the time for appeal having expired and no
appeal having been taken) or

(b)  in the case of any Liabilities not resulting
from the assertion of liability by a third party, a written
statement from Buyer setting forth the amount of the
Liabilities as finally determined and briefly describing the
basis for such determination.

7.  <u>Concerning Escrow Agent</u>.

(a)  Escrow Agent shall be paid a fee of $
(the "Initial Fee") for its acceptance of the Escrow Fund
and its agreement to act as Escrow Agent hereunder and an
annual fee and service fees in accordance with its
established schedule of fees as in effect from time to time.
In addition, Buyer shall reimburse Escrow Agent for all
reasonable expenses, disbursements and advances incurred or
made by it in the performance of its duties hereunder,
including reasonable attorney's fees.  All of Escrow Agent's
fees, expenses, disbursements and advances shall be paid by
Buyer.  Buyer shall pay to Escrow Agent on the date of the
execution and delivery of this Escrow Agreement $
as the Initial Fee and Escrow Agent's annual fee for the
first year that this Escrow Agreement is to be in effect.

(b)    Escrow Agent may resign and be discharged from its duties hereunder at any time by giving notice of such resignation to Buyer, Seller and the Stockholders specifying the date when such resignation shall take effect. Upon such notice, a successor Escrow Agent shall be appointed with the unanimous consent of Buyer, Seller and the Stockholders, such successor Escrow Agent to become Escrow Agent hereunder upon the resignation date specified in such notice. If Buyer, Seller and the Stockholders are unable to agree upon a successor Escrow Agent within 30 days after such notice, Escrow Agent shall be entitled to appoint its successor. Escrow Agent shall continue to serve until its successor accepts the escrow and receives the Escrow Fund. Buyer, Seller and the Stockholders shall have the right at any time upon their mutual consent to substitute a new Escrow Agent by giving notice thereof to the Escrow Agent then acting.

(c)    Escrow Agent undertakes to perform such duties as are specifically set forth herein and may conclusively rely, and shall be protected in acting or refraining from acting, on any written notice, instrument or signature believed by it to be genuine and to have been signed or presented by the proper party or parties duly authorized to do so. Escrow Agent shall have no responsibility for the contents of any writing contemplated herein and may rely without any liability upon the contents thereof.

(d)    Escrow Agent shall not be liable for any action taken or omitted by it in good faith and believed by it to be authorized hereby or within the rights or powers conferred upon it hereunder, nor for action taken or omitted by it in good faith, and in accordance with advice of counsel (which counsel may be of Escrow Agent's own choosing), and shall not be liable for any mistake of fact or error of judgment or for any acts or omissions of any kind unless caused by willful misconduct or gross negligence.

(e)    Each party hereto agrees to indemnify Escrow Agent and hold it harmless against any and all liabilities incurred by it hereunder as a consequence of such party's action, and the parties agree jointly to indemnify Escrow Agent and hold it harmless against any and all liabilities incurred by it hereunder that are not a consequence of any party's action, except in either case for liabilities incurred by Escrow Agent resulting from its own willful misconduct or gross negligence.

CHMAIN02 Doc: 104663_1                    5