8.    Miscellaneous.

(a)  This Escrow Agreement shall be construed by and governed in accordance with the laws of the State of Illinois.

(b)  This Escrow Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assigns of the parties hereto.

(c)  This Escrow Agreement may be executed in one or more counterparts, but all such counterparts shall constitute but one and the same instrument.

(d)  Section headings contained in this Escrow Agreement have been inserted for reference purposes only and shall not be construed as part of this Escrow Agreement.

(e)  All notices, requests, demands and other communications hereunder shall be in writing (including telecopy or similar writing) and shall be given to the parties at their respective addresses set forth below:

To Seller and the Stockholders:

Martin A. Smith
5300 Long Island Drive
Atlanta, Georgia 30327
Telecopy No.: (404) 255-1876

With a copy to:

Rogers & Hardin
2700 Cain Tower, Peachtree Center
229 Peachtree Street, N.E.
Atlanta, Georgia 30303
Attention:  Michael Rosenzweig, Esq.
Telecopy No.: (404) 525-2224

To Buyer:

Stimsonite Corporation
7542 Natchez Avenue
Niles, Illinois  60714
Attention:  President
Telecopy No.:  (708) 647-2310

With a copy to:

Jones, Day, Reavis & Pogue
77 West Wacker
Chicago, Illinois 60601-1692
Attention: Timothy J. Melton, Esq.
Telecopy No.: (312) 782-8585

To Escrow Agent:

LaSalle National Trust, N.A.
135 S. LaSalle Street
Chicago, Illinois 60603
Attention:
Telecopy No.: (312) 443-2500

or to such other address or telecopy number as such party
may hereafter specify by notice to the other parties in
writing.  Each such notice, request, demand or other
communication shall be effective (a) if given by telecopy,
when such telecopy is transmitted to the telecopy number
specified above and the appropriate confirmation is
received, and a written confirmation is sent by U.S. Mail,
postage prepaid, or (b) if given by any other written means,
when delivered at the addresses specified above.

IN WITNESS WHEREOF, the parties have caused their duly
authorized representatives to execute this Escrow Agreement as of
the date first above written.

PAVE-MARK CORPORATION

By_____

    Its _____

THE STOCKHOLDERS

_____

Name:  Martin A. Smith

_____

Name:  Judith Smith

_____

Name:  Walter B. Finley

STIMSONITE CORPORATION

By_____

    Its _____

LASALLE NATIONAL TRUST, N.A.

By_____

    Its _____

CHMAIN02 Doc: 104663_1

8

EXHIBIT B

## ALLOCATION OF PURCHASE PRICE

The Purchase Price and the Assumed Liabilities shall be
allocated in accordance with the attached Schedule.

Exhibit C

[Letterhead of Rogers & Hardin]

, 1995

Stimsonite Corporation
7542 Natchez Avenue
Niles, Illinois 60714

Re:   Purchase Agreement dated as of April 28, 1995 (the "Purchase
      Agreement") by and among Pave-Mark Corporation ("Seller"),
      Martin A. Smith, Judith Smith and Walter B. Finley (collectively,
      the "Stockholders") and Stimsonite Corporation (including any of its
      wholly-owned subsidiaries, "Buyer").

Gentlemen:

        We have acted as counsel for Seller named in the Purchase Agreement
providing for the purchase by Buyer of substantially all of the assets relating to the
Business of Seller. This opinion is furnished to you pursuant to Section 4.2(c) of the
Purchase Agreement. Unless otherwise defined herein, capitalized terms used in this
opinion that are defined in the Purchase Agreement are used herein as so defined.

        We have examined such documents, records and matters of law as we have
deemed necessary for purposes of this opinion. In such examination, we have assumed
that the signatures (other than those of Buyer and its employees) examined by us are
genuine, that where any such signature purports to have been made in a corporate,
governmental, fiduciary or other capacity, the person who affixed such signature had
authority to do so, that all documents submitted to us as originals are authentic and that
the documents submitted to us as certified or conformed copies conform to original
documents.

        Based upon the foregoing and subject to the qualifications set forth herein,
we are of the opinion that:

        1.      Seller is a corporation duly organized, validly existing and in good
standing under the laws of the State of Florida with corporate power and
authority to own, lease or operate its assets and properties, to make and perform
the Purchase Agreement and to perform the transactions contemplated thereby.

        2.      The Purchase Agreement and the transactions contemplated
thereunder have been duly authorized, executed and delivered by Seller and the
Stockholders and constitutes the valid, binding and enforceable obligation of
Seller and the Stockholders.

Stimsonite Corporation
, 1995
Page 2

3.      Neither the execution and delivery of the Purchase Agreement by Seller or the Stockholders, nor the performance of their respective obligations thereunder, will result in the violation of any state or federal statute or regulation, or any order or decree known to us of any court or governmental Authority binding upon Seller, its property or the Stockholders, or conflict with or result in a default or the creation of a Lien under any of the provisions of Seller's Articles of Incorporation or bylaws or any indenture, loan agreement or other agreement to which Seller is bound.

The opinion set forth in paragraph 2 above is subject to the effect of (a) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors rights generally, and (b) general principles of equity, including the possible unavailability of specific performance or injunctive relief, regardless of whether such enforceability is considered in a proceeding in equity or at law.

We have assumed that the Purchase Agreement has been duly authorized, executed and delivered by Buyer.

In rendering this opinion, we have relied as to matters of fact solely upon such certificates of the officers of Seller as we have considered appropriate and have not made any independent investigation or inquiry whatsoever with respect to the matters of fact set forth in such certificates.

We are members of the bar of the State of Georgia and in rendering this opinion, our examination of matters of law has been limited to, and we express no opinion as to the law of any jurisdiction other than United States federal law and the laws of the States of Georgia and Florida, and with respect to all matters governed by the laws of the State of Florida, we have relied upon the opinion of the law firm of , copies of which have been furnished to you. In passing on the enforceability of the Purchase Agreement, we have assumed that the laws of the State of Illinois are the same as those of the States of Georgia and Florida, and we have considered only the laws of the States of Georgia and Florida.

This opinion is furnished by us, as counsel for Seller and the Stockholders, to you solely for your benefit, upon the understanding that we are not hereby assuming any professional responsibility to any other person whatsoever, and may not be quoted or relied upon by any other person without our prior written consent.

Very truly yours,

Exhibit D

[Letterhead of Jones, Day, Reavis & Pogue]

, 1995

Pave-Mark Corporation
1855 Plymouth Road
Atlanta, Georgia

Re:    Purchase Agreement dated as of April 28, 1995 (the "Purchase
Agreement") by and among Pave-Mark Corporation ("Seller"),
Martin A. Smith, Judith Smith and Walter B. Finley (collectively,
the "Stockholders") and Stimsonite Corporation (including any of its
wholly-owned subsidiaries, "Buyer").

Ladies and Gentlemen:

We have acted as counsel for Buyer named in the Purchase Agreement
providing for the purchase by Buyer of substantially all of the assets relating to the
Business of Seller. This opinion is furnished to you pursuant to Section 4.3(c) of the
Purchase Agreement. Unless otherwise defined herein, capitalized terms used in this
opinion that are defined in the Purchase Agreement are used herein as so defined.

We have examined such documents, records and matters of law as we have
deemed necessary for purposes of this opinion. In such examination, we have assumed
that the signatures (other than those of Buyer and its employees) examined by us are
genuine, that where any such signature purports to have been made in a corporate,
governmental, fiduciary or other capacity, the person who affixed such signature had
authority to do so, that all documents submitted to us as originals are authentic and that
the documents submitted to us as certified or conformed copies conform to original
documents.

Based upon the foregoing and subject to the qualifications set forth herein,
we are of the opinion that:

1.    Buyer is a corporation duly organized, validly existing and in good
standing under the laws of the State of Delaware with corporate power and
authority to make and perform the Purchase Agreement and to perform the
transactions contemplated thereby.

2.    The Purchase Agreement and the transactions contemplated
thereunder have been duly authorized, executed and delivered by Buyer and
constitutes the valid, binding and enforceable obligation of Buyer.

Pave-Mark Corporation
    , 1995
Page 2

The opinion set forth in paragraph 2 above is subject to the effect of (a) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors rights generally, and (b) general principles of equity, including the possible unavailability of specific performance or injunctive relief, regardless of whether such enforceability is considered in a proceeding in equity or at law.

In rendering this opinion, we have assumed that the Purchase Agreement has been duly authorized, executed and delivered by Seller and the Stockholders.

In rendering this opinion, we have relied as to matters of fact solely upon such certificates of the officers of Buyer as we have considered appropriate and have not made any independent investigation or inquiry whatsoever with respect to the matters of fact set forth in such certificates.

We are members of the bar of the State of Illinois and in rendering this opinion, our examination of matters of law has been limited to, and we express no opinion as to the law of any jurisdiction other than, the laws of the State of Illinois, the General Corporation Laws of the State of Delaware and United States federal law.

This opinion is furnished by us, as counsel for the Buyer, to you solely for your benefit, upon the understanding that we are not hereby assuming any professional responsibility to any other person whatsoever, and may not be quoted or relied upon by any other person without our prior written consent.

Very truly yours,

CHMAIN02 Doc: 104344_2



Hercules 4000

Iron Eagle Equipment Corporation

# INTRODUCTION

The Hercules Series Longliner, as manufactured by Pave-Mark Corporation, is a state-of-the-art self-contained thermoplastic delineation material application system engineered for the delineation professional. The unit has been custom engineered for Iron Eagle Equipment Corporation.

The Hercules Longliner has been designed with features to enable the customer's personnel to efficiently apply large quantities of hot-applied thermoplastic pavement delineation materials by the screed/extrusion method. The unit features two 1,000 pound oil-jacketed melting kettles with control and agitator systems.

The oil-jacketed delivery conduit system and the screed/ extrusion dies are heated by means of an oil circulation system utilizing the kettles as the oil reservoirs. The dies are air actuated and controlled by an electronic timing system.





### VEHICLE (Chassis)

The vehicle upon which the Hercules Longliner equipment is
mounted, and which is by reference a part of the Hercules
system, is a diesel powered Mercedes-Benz Model L1319 chassis
with maximum gross vehicle weight of 30,000 pounds.

The platform mounted on the vehicle chassis is of all welded
steel construction. The bed is approximately 216 inches long and
96 inches wide.  The longitudinal structural members are of 9
inch steel channel.  The transverse structural members are 3 inch
steel channel.  The structural frame is overlaid with 3/16 inch
non-skid steel plate.  The rear of the cab is protected by a 96
inch wide by 42 inch high bulkhead.  The rear 44 inches of the
bed is raised 9 inches to accommodate the dispensing system
carriages and to serve as an operator platform.  Mounted on the
raised rear portion of the bed are the operator control stations
and the glass sphere storage tank.  The glass sphere storage tank
is located on the rear portion of the bed between the operator
consoles.



## KETTLE SYSTEM

The Pave-Mark manufactured thermostatically regulated Vulcan kettles incorporated as an integral part of the Hercules Series 4000 Longliner are of all steel construction and designed to provide dependable, trouble-free service. The kettles are of such dimensions as to contain approximately 2,000 pounds of molten Pave-Mark thermoplastic pavement delineation material when filled to optimum operating capacity. The oil-jacketed kettles are engineered to utilize propane fuel, and to provide for agitation of the molten material utilizing hydraulically powered agitation systems with the necessary and conveniently accessible controls. The kettles serve as reservoirs for the hot-oil circulating systems utilized to provide heat to the two material conduit and dispensing systems.

Agitation for the kettles is provided by a hydraulic pump, powered by an auxillary diesel engine, and hydraulic motors mounted above each of the individual kettles. The agitation systems are designed to prevent the solid components of the molten material (i.e. glass spheres, pigment, etc.) from settling and to insure a supply of homogenously blended material to the dispensing devices.

The thermostatically regulated burner system is composed of a burner unit with appropriate industry accepted controls and regulators to provide for safe operation. The burner unit consists of eight-eight number 73 nozzles with approximately three hundred eighty five thousand BTU input capacity. Propane is supplied through a system which consists of a pressure regulator, a pilot assembly providing for main gas control, and a by-pass equipped, high capacity gas thermostat. This system provides positive control of the gas supply to the main burner unit and prevents gas flow without pilot flame to actuate the thermocouple controlled pilot assembly.

# VULCAN KETTLES

## Thermoplastic Pavement Marking Premelter
## Series 600   1200   1500   2000   2500

# Owners Handbook

Serial # _____





CORPORATION

### PAVE-MARK VULCAN
### PREMELTING KETTLE
### OPERATION AND MAINTENANCE

PAVE-MARK'S Vulcan Premelting Kettles are specifically engineered to efficiently and homogenously melt thermoplastic pavement marking materials supplied in either block or granular form.

I.    KETTLE INSTALLATION:
      Kettles should be secured with (8) 1/2-13 bolts to a metal trailer or truck bed floor plate. See the hole layout below, it is shown for two kettles.



| KETTLE SIZE | A |
|---|---|
| 40 GAL-600 lb * | 30 3/4" |
| 80 GAL-1200 lb * | 35 3/4" |
| 100 GAL-1500 lb * | 35 3/4" |
| 135 GAL-2000 lb * | 35 3/4" |
| 170 GAL-2500 lb * | 35 3/4" |

      * Weight is an approximation based on heated thermoplastic weighing 15 pounds per gallon. Thermoplastic formulation weights per gallon can vary plus or minus 20%. Kettle volume, for safety, is measured 5 inches below cover.

II.   PROPANE GAS CONNECTIONS:
      Use a minimum of two 100 pound tanks for propane supply with a pressure gauge capable of reading up to 300 PSI.

PITCH CHECK:
Hydraulic fluid level at tank temperature sight gauge (Fig. ). Use Gulf Harmony 32 hydraulic fluid or its equal. Check hoses and fittings for leaks.
Check heat transfer oil level is up to ring on dip stick (Fig. B, #24) on kettle. Use one of the following heat transfer oils: Gulf Security 180M, Texaco Regal oil "G", Mobil Vltrea oil 72, or Martemp 2525. DO NOT MIX OIL BRANDS. Use dip stick (Fig. A, #2) to check engine oil level, service with SAE #30 oil. Check engine air cleaner bowl oil level. Change oil at least every 50 engine working hours. Refer to your engine manual, for further information.
Check LP gas fittings from main gas supply tank to premelter kettle burners.

IV. LIGHTING PREMELTER KETTLE BURNER:
1. Turn Robert Shaw control valve (Fig. B #25) and Pilot Safety light valve knob (Fig. B, #26) to "OFF" position.
2. Turn main LP gas tank valves to "ON".
3. Turn Pilot Safety light valve to "ON".
4. Open burner access door (Fig. B, #34) located below material discharge valve. Depress pilot Red Button (Fig. B, #26) and light the pilot (Fig. A, #21). Keep pilot Red Button depressed for 60 seconds. CAUTION: If pilot fails to light, wait until gas is absent prior to relighting. Protect body from flame.
5. Close burner access door.
6. Allow pilot flame to stabilize a few minutes.
7. With door closed, raise Robert Shaw control valve to 350 F.
8. If you have an air jacketed kettle load it with 150 to 300 lb. of material, depending on the size you have. (about 1/4 full).
9. When material temperature gauge (Fig. B #27) approaches 350 F reset temperature setting above 400 F. to as high as 450 F, depending on weather conditions and quantity of materials you plan to insert in the kettle. If you have an oil jacketed kettle you should NEVER ALLOW HEAT TRANSFER OIL TEMPERATURE TO EXCEED 550 F. Start feeding thermoplastic into the kettle once oil temperature exceeds 400 F.
10. Low pressure flame can be used during initial heat up to soften material which has hardened in the molasses type discharge valve. (Fig B, #35) Optional plug valve does not use this burner (Fig. B, #30).

V. THERMOPLASTIC MATERIAL FEED:
1. Make sure material draw off valve (Fig. B, #29) is closed.
2. Practice timing the feeding of granulated bags or hand size chunks of block thermoplastic into the kettle. Once molten, add more material.
3. When material temperature gauge approaches 350 F and the material is molten, turn on your engine and commence agitating material.
4. Material should be heated between 400-440 F. On cooler working days, higher temperatures are required. (Up to 440 F).

-2-

5. Occasionally insert a long stem thermometer in thermoplastic to check the calibration of your kettle material temperature gauge.

6. The higher the volume of molten material in kettle, the quicker fresh cold material will achieve working temperature.

7. During non working or extensive travel time, reduce the temperature of the material. Although heat stable, thermoplastic material should not be held more than 4 hours at or near its application temperature without being used.

8. Constantly turnover material adding fresh material.

9. Read and understand "Standard practices for successful alkyd hydrocarbon and epoxy thermoplastic pavement markings application".

VI.  ENGINE OPERATION: (READ ENGINE OPERATION MANUAL)

1. Engine throttle should be approximately one third open.

2. Hydraulic selector valve should be in neutral position during the engine starting cycle.

3. Prime engine by depressing push button on engine regulator.

4. Turn engine key (Fig. A, #3) to start engine.

5. Let engine warm up a few minutes, then place hydraulic selector valve (Fig. A, #4) forward to engage material agitation blades.

6. Open material feed door and check for movement of paddles. If no movement, material has not liquefied sufficiently. Return selector valve to neutral until material melts.

VII. HYDRAULIC SYSTEM:

1. Selector valve (Fig. A, #6) allows for forward, reverse and neutral operating positions. Obstructions such as solid material or foreign debris will prevent free rotation of paddle but will not damage hydraulic system.

2. Needle valve (Fig. A, #4) is used to adjust the speed of the mixing paddle.

3. Check hydraulic oil temperature and maintain below 180 F.

VIII. SHUT DOWN:

1. Turn temperature control and pilot light valve to "OFF" position. Depress red button on pilot light valve for approximately 10 seconds to shut off flame. Look inside lighting door to insure that flame is out.

2. Continue material motor agitation until oil and material temperature are below 300 F.

3. Turn main gas control valves on propane tanks "OFF".

4. Turn engine ignition switch off to protect battery.

5. Keep material feed door closed to avoid water or foreign matter from entering.

6. Material level should be kept low for next days introduction of fresh material.

IX.  MAINTENANCE:

1. DAILY;

a) Check hydraulic oil level (Fig. A, #1)

b) Check that hydraulic shut-off valve (Fig. A, #7) is fully open.

-3-



    c) Check hydraulic pump coupler for alignment and possibly
      missing lock ring. (Fig. A, #8)
    d) Check hydraulic lines for leaks and hose deterioration.
    e) Make sure cap is on LP gas preset regulator.
      (Fig. B, #31)
    f) Check engine oil level (Fig. A, #2).
    g) Check oil temperature probe packing nut (Fig. B, #32)
      for leaks. Tighten nut without over torquing. Packing may
      periodically require replacement.
    h) Check propane tanks condition. They should be leak and
      rust free.

  WEEKLY;
    a) Grease shaft bearing (Fig. A,#9) with lubriplate AC-2A,
      Enco Andock B or equivalent.
    b) Check heat transfer oil level (Fig. B, #24).
    c) Change engine oil at least every 50 hours of operation,
      and maintain oil change records.
    d) Check material and oil temperature gauges with a long
      stem high temperature thermometer. Recalibrate gauges
      when necessary.
    e) Check interior of kettle and remove possible excessive
      resin build up, particularly inside kettle top.
3. EVERY 6 MONTHS;
    a) Remove and replace hydraulic filter (Fig. A, #10).
4. YEARLY;
    a) Drain a quart of heat transfer oil and have analyzed by
      oil company for flash point, carbon and other impurities.
      (Minimum flash point of oil should be above 490 F).
    b) Replace hydraulic fluid with Gulf Harmony 32 or equal.

SEASONAL SHUTDOWN:
1. Drain material and clean inside of kettle.
2. Lubricate all grease fittings.
3. Clean exterior and, if required, repaint with high
   temperature silver paint.
4. Disconnect and paint propane tanks.

CHANGING MATERIAL COLORS OR MATERIAL RESIN TYPES
1. Maintain an inventory of reuseable Pave-Mark material boxes
   for draining material.
2. White To Yellow-drain all of the remaining material from
   kettle into Pave-Mark drain-off boxes for later reuse.
   Scrape as much material from the kettle as possible while
   warm; including discharge spout. Residue white material
   will disappear into your fresh yellow material.
3. Yellow-To-White-thoroughly drain and wipe clean kettle
   interior of all yellow materials. You may melt 50 pounds of
   new white material for dilution of yellow residue. This
   material, when discharged into a drain-off box can be reused
   with your next yellow color use.
4. Alkyd, Hydrocarbon and Epoxy thermoplastic materials are
   kettle incompatible with each other. Therefore, the kettles
   should be nearly completely cleaned out when changing
   material types. Pave-Mark cleaning fluids and
   recommendations are available for intense kettle clean-out.
                     -4-



## XII. PARTS LIST:

| Fig. No. | Part Description | Part No. |
|---|---|---|
| A #1 | SIGHT GAUGE | E-PM05076 |
| A #2 | KOHLER ENGINE | E-PM95001 |
| A #4 | SPEED VALVE | E-PM98108 |
| A #5 | PADDLE ASSEMBLY | E-PM98113 |
| A #6 | DUKES CONTROL VALVE 1/2" | E-PM98020 |
| A #7 | GATE VALVE 1/2" | E-PM98070 |
| A #8 | COUPLER | E-PM98114 |
| A #9 | BEARING 1 1/2" RCJT | E-PM98111 |
| A #10 | HYDRAULIC FILTER | E-PM98060 |
| A #11 | ENGINE CARBURETOR | E-PM05035 |
| A #12 | HYDRAULIC OIL | E-PM05120 |
| A #13 | SPROCKET OS15-1" | E-PM05147 |
| A #14 | SPROCKET OS30-1 1/2" | E-PM05148 |
| A #15 | HYDRAULIC PUMP | E-PM98102 |
| A #16 | HYDRAULIC MOTOR | E-PM05101 |
| A #17 | SINGLE LINK CHAIN | E-PM05148 |
| A #18 | AGITATION SHAFT | E-PM98106 |
| A #19 | CHAIN GUARD | E-PM98122 |
| A #20 | UPPER SHAFT BEARING PLATE | E-PM98112 |
| A #21 | PILOT, LIGHT | E-PM96045 |
| A #22 | BURNER X88 | E-PM96101 |
|  | BURNER X44 (600 SERIES ONLY) | E-PM96111 |
| A #23 | BURNER JET | E-PM96110 |
|  |  |  |
| B #24 | HEAT TRANSFER OIL INLET | E-PM01525 |
| B #25 | THERMOSTAT | E-PM05175 |
| B #26 | PILOT VALVE (BASO) | E-PM05127 |
| B #27 | GAUGE, MATERIAL | E-PM05070 |
| B #28 | GAUGE, OIL | E-PM05070 |
| B #29 | MOLASSES DRAIN VALVE | E-PM98110 |
| B #30 | INTERNAL PLUG VALVE | E-PM98105 |
| B #31 | LP REGULATOR | E-PM98101 |
| B #32 | STUFFING BOX | E-PM05160 |
| B #33 | OIL THERMOCOUPLE | E-PM05170 |
| B #34 | LIGHTING DOOR | E-PM98123 |
| B #35 | MOLASSES VALVE BURNER | E-PM98121 |

FOR PARTS ORDERING OR TECHNICAL INSTRUCTION, PLEASE CONTACT:

PAVE-MARK CORPORATION
EQUIPMENT DIVISION P.O. BOX 94108
ATLANTA, GA. 30318 (404) 351-9780
FAX No. (404) 350-9673

-5-

NANCY
RAMSEY